IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re:                                           Case No.: 1:08-CV-76

KMART CORPORATION, et al.,                       Honorable Judge John F. Grady

      Debtors.

---

| | |
|---|---|
| RUBLOFF DEVELOPMENT GROUP, INC., ) | Appeal from the United States |
| ) | Bankruptcy Court for the Northern |
|     Appellant, ) | District of Illinois, Hon. Susan Pierson |
| ) | Sonderby, Case No. 02-02474 (jointly |
| v. ) | administered) |
| ) | |
| KMART CORPORATION, ) | |
| ) | |
|     Appellee. | **ORAL ARGUMENT REQUESTED** |

### BRIEF OF APPELLANT,
### RUBLOFF DEVELOPMENT GROUP, INC.

Thomas J. Lester
Matthew M. Hevrin
HINSHAW & CULBERTSON LLP
100 Park Avenue
P.O. Box 1389
Rockford, IL 61105-1389
Phone: (815) 490-4900
Facsimile (815) 490-4901

*Attorneys for Appellant,*
*Rubloff Development Group, Inc.*

Dated: January 24, 2008

70549398v1 810787

# TABLE OF CONTENTS

Page

I.   STATEMENT OF THE CASE ...................................................................... 1

II.  BASIS OF APPELLATE JURISDICTION .................................................. 1

III. STATEMENT OF ISSUES PRESENTED ..................................................... 2

IV.  REQUEST FOR ORAL ARGUMENT UNDER FED.R.BANKR.P.8012 ....................... 2

V.   STATEMENT OF FACTS ........................................................................ 3

VI.  ARGUMENT ....................................................................................... 8
     A.   Standard of Review ..................................................................... 8
     B.   The bankruptcy court erroneously concluded that KMART did not
          anticipatorily repudiate its obligations under the Subleases. ................... 8
     C.   The bankruptcy court erroneously concluded that RUBLOFF agreed to
          assume all of KMART's obligations under the Subleases and to hold
          KMART harmless from claims and damages under the Subleases. ................. 20
     D.   Even if the bankruptcy court correctly concluded that the Assignment and
          Assumption Agreement was ambiguous, the agreement should have still
          found that the term "Leases" referred solely to the Master Leases .............. 24
     E.   The bankruptcy court erroneously concluded that RUBLOFF waived its
          claims when it took an assignment of the Master Leases without reserving
          said claims ................................................................................ 28

VII. CONCLUSION .................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**                                                                                      Page

*Mungo v. Taylor*, 355 F.3d 969, 974 (7th Cir. 2004) ........................................................ 8

*Golant v. Care Comm, Inc.*, 216 B.R. 248, 252 (N.D.Ill. 1997) ....................................... 8

*Leibowitz v. Parkway Bank & Trust Co.*, 210 B.R. 298, 301 (N.D.Ill. 1997) .................. 8

*Kenisoft Development Corp. v. Softbank Holdings, Inc.*, 139 F.Supp.2d.        9,13,17,
869 (N.D. Ill. 2001) .......................................................................................    23

*Central States SE and SW Pension Fund v. Basic American Industries, Inc.*, 252 F.3d    9,16,18,
911, 915 (7th Cir. 2001) .................................................................................    24

*Leo v. Pearce Stores Company*, 57 F.2d 340, 341 (E.D.Mi. 1932) ................................. 9

*Utility Audit, Inc. v. Horace Mann Service Corp.*, 383 F.3d 683 (7th Cir. 2004) ............. 22

*Asad v. Hartford Insurance Co.*, 116 F.Supp.2d 960 (N.D. Ill. 2000) ............................. 24

*Chemetall GMBH v. ZR Energy, Inc.*, 320 F3d 714 (7th Cir. 2003) ................................ 25,27

*North Shore Gas Co. v. Salomon*, 152 F.3d 642 (7th Cir. 1998) ..................................... 25

*Thomas v. Pearl Vision*, 251 F.3d 1132 (7th Cir. 2001) ................................................. 21,25

*Aerovias Nacionales DeColumbia, S.A. Avianca*, 323 B.R. 879, 889
(Bankr. S.D.N.Y. 2005) ................................................................................... 28,29

**State Cases**

*Paul v. Bogle*, 193 Mich.App. 479, 493; 484 N.W.2d 728 (Mich.App. 1992) ................. 9,13,17,
                                                                                                       23

*Keep Productions Inc. v. Arlington Park Towers Hotel Corporation*, 49 Ill.App.3d
258, 264-265, 364 N.E.2d 939, 944 (1st Dist. 1977) ......................................... 9

*Stanton v. Dachille*, 186 Mich.App. 247, 252; 463 N.W.2d 479 (Mich.App. 1990) ........ 9,18,24

*Builders Concrete Company of Morton Grove v. Fred Faubel and Sons, Inc.*,        9,18,19,
58 Ill.App.3d 100 (3rd Dist. 1978) .................................................................. 30

*Stoddard Manufactures National Bank of Grand Rapids*, 593 N.W.2d 630
(Michigan Appellate Court 1999) .................................................................. 9

*Jim-Bob, Inc. v. Mehling*, 178 Mich.App.71, 443 N.W.2d 451 (Mich.App. 1989) .......... 9

*Vozza v. Garrow*, 1999 WL 33435364 (Mich.App.1999) ................................................ 9

*Bowman v. Zimmy*, 256 Ill.App.3d 386, 390, 628 N.E.2d. 384 (1st Dist. 1993) .............. 19

*Klapp v. United Insurance Group Agency, Inc.*, 468 Mich. 459, 470 (2003) ................... 25

*Wilkie v. Auto-Owners Insurance Company*, 469 Mich. 41, 61 (2003) ............................ 21,25

*Automotive Management Group, Ltd. v. SRB Management Co., Inc.*, 239 A.D.2d 450,
451, 658 NYS2d 54, 55 (2d Dept. 1997) ........................................................ 28

i

## TABLE OF AUTHORITIES

**Federal Statutes and Regulations**                                   Page

28 U.S.C. §§157 and 1334 ........................................................... 1

28 U.S.C. §158 ........................................................................... 1

28 U.S.C. §158(a)(1) ................................................................... 1

11 U.S.C. Sec. 365 (h)(1)(A) ...................................................... 12,14

11 U.S.C. § 365 ........................................................................... 3,15,
                                                                                  16,26

**Federal Rules**

Local Rule 40.3.1(a) ................................................................... 1

Fed.R.Bankr.P.8002 ................................................................... 1

Fed.R.Bankr.P.8012 ................................................................... 2

Fed.R.Bank.P.6006 .................................................................... 26

70550233v1 810787

## I.    STATEMENT OF THE CASE

Appellant, RUBLOFF DEVELOPMENT GROUP, INC., an Illinois corporation, hereinafter referred to as "RUBLOFF", filed eight (8) Proofs of Claim in the KMART bankruptcy proceedings to recover the difference or spread between the lesser amount of rents which RUBLOFF agreed to pay under certain subleases between RUBLOFF and KMART (the "Subleases") and the greater amounts RUBLOFF is now required to pay third-party landlords under certain leases originally entered into between KMART and third-party landlords (the "Master Leases") when RUBLOFF was forced to accept an assignment of the Master Leases as the only means by which RUBLOFF could preserve its interest (and the interests of its subtenants and lenders) in the properties it had subleased from KMART. RUBLOFF's aggregate claims under the Proof of Claims for the spread damages is in excess of $28,000,000.

The matter was tried before U.S. Bankruptcy Judge Susan P. Sonderby on May 14, 2007. On November 20, 2007, Judge Sonderby entered an Order disallowing each of the eight (8) Claims filed by RUBLOFF. RUBLOFF appeals the disallowance of its Claims and contends that said Claims should have been allowed.

## II.    BASIS OF APPELLATE JURISDICTION

The United States Bankruptcy Court for the Northern District of Illinois exercised jurisdiction to enter the Orders appealed from under 28 U.S.C. §§157 and 1334 and Local Rule 40.3.1(a) of this Court. Those orders are final for purposes of 28 U.S.C. §158. On November 30, 2007, pursuant to Fed.R.Bankr.P.8002, RUBLOFF timely filed a Notice of Appeal. This Court has jurisdiction of the captioned appeal under 28 U.S.C. §158(a)(1).

70549966v3 810787

### III.    STATEMENT OF ISSUES PRESENTED

1.    Whether the bankruptcy court erred in holding that a subtenant must wait for a formal rejection of a master lease by the debtor before there can be an anticipatory repudiation by the debtor of the sublease.

2.    Whether the bankruptcy court erred in holding that Rubloff's claims were effectively released by Rubloff by virtue of certain terms of the assignment agreement and subleases.

3.    Whether the bankruptcy court erred in holding that the meaning of the words "Lease" and "Leases" in the Assignment and Assumption Agreement is ambiguous.

4.    Whether the bankruptcy court erred in considering extrinsic evidence in interpreting the provisions of the Assignment and Assumption Agreement.

5.    Whether the bankruptcy court erred in failing to construe the Assignment and Assumption Agreement against Kmart as the drafter thereof.

6.    Whether the bankruptcy court erred in holding that the word "Leases" used in the Assignment and Assumption Agreement included the Subleases.

7.    Whether the bankruptcy court erred in holding that Rubloff agreed to assume the "spread damages" claim liability pursuant to the Assignment and Assumption Agreement.

8.    Whether the bankruptcy court erred in holding that Rubloff agreed in the Assignment and Assumption Agreement to hold Kmart harmless from the spread damages claim.

9.    Whether the bankruptcy court erred in holding that Rubloff could look only to Kmart's assignee (in this matter, Rubloff) pursuant to the terms of the subleases, and therefore Rubloff could only look to Rubloff for the spread damages.

10.    Whether the bankruptcy court erred in holding that Rubloff's claims were waived when Rubloff failed to raise them when it entered into the Assignment and Assumption Agreement.

### IV.    REQUEST FOR ORAL ARGUMENT UNDER FED.R.BANKR.P.8012

While District Courts have discretion to proceed otherwise, as a general rule, oral argument should be granted in bankruptcy appeals.   See Fed.R.Bankr.P.8012.   RUBLOFF believes that oral argument would be of assistance to the court in this appeal not only due to the complexity of the interrelation of laws between the Bankruptcy Code, laws of the State of Illinois (where some of the properties at issue were located), and the laws of the State of Michigan

70549966v3 810787

(where the remainder of the properties at issue were located), but also because this case presents a unique question of when anticipatory repudiation applies with respect to subleases in the context of Section 365 of the Bankruptcy Code.

## V.    **STATEMENT OF FACTS**

KMART is a Michigan corporation with a principal place of business in Troy, Michigan.[1] (Rubloff R.22, Findings of Fact at p. 1).   RUBLOFF is a diversified real estate development company. (*Id.* at p.1).

Between October of 1998 and July of 2000, KMART subleased to RUBLOFF eight (8) properties located in Illinois and Michigan (collectively, the "Demised Premises") pursuant to individual subleases (collectively, the "Subleases") (*Id.* at p. 1).   KMART leased the Demised Premises from third-party landlords (collectively, the "Master Landlords") pursuant to leases (collectively, the "Master Leases") and continued to pay rent on these closed stores. (*Id.* at 1). In an effort to reduce its losses from these aging properties, KMART subleased the eight (8) properties to RUBLOFF at rents that were substantially less than the rents KMART had agreed to pay the Master Landlords under the Master Leases. (*Id.* at p. 1).   This difference between the rents that RUBLOFF agreed to pay KMART under the Subleases and the rents KMART agreed to pay the Master Landlords under the Master Leases has been referred to in these proceedings as the "spread amount" and is the basis for RUBLOFF's proofs of claim ("collectively the "Claims") and is summarized in Rubloff R.1.

After each of the Subleases was executed and with full knowledge and consent of KMART, RUBLOFF entered into sub-subleases (collectively, the "Sub-Subleases") with

---

[1] For convenience, references to the record items submitted by RUBLOFF shall be in the form "Rubloff R.____", with the ____ representing a given item number from RUBLOFF's Designation of Items to be included in the record on appeal.

70549966v3 810787

regional and national retailers (collectively, the "Sub-Subtenants") at each of the Demised Premises. (*Id.* at p. 2; Rubloff R. 23 at p. 13-15). In connection with the Sub-Subleases, RUBLOFF made substantial improvements at each of the Demised Premises. (*Id.*) These improvements included renovating and partitioning the large, vacant buildings into separate spaces for each of the Sub-Subtenants, as well as improvements to the interior and exterior of these stores for many of the Sub-Subtenants (collectively, the "Improvements"). (*Id.*). To pay for the Improvements, RUBLOFF obtained approximately $12,000,000 in loans from various lenders and granted its lenders subleasehold mortgages (collectively, the "Subleasehold Mortgages") on RUBLOFF's interest as subtenant in the Subleases. (*Id.*).

On January 22, 2002, KMART filed for relief under Chapter 11 of the Bankruptcy Code. (Findings of Fact at p. 2). On that same date, with other first day motions, KMART filed a motion to reject over 300 leases and subleases, including the Master Leases and Subleases for the Demised Premises (the "Rejection Motion"). (*Id.* at p. 2; Rubloff R.2). Schedule A to the Rejection Motion identified leases and subleases to be immediately rejected. Six of the Master Leases and Subleases were on Schedule A when the Rejection Motion was filed. Schedule B contained leases and subleases for rejection upon ten days notice by KMART to the affected party and the unsecured creditors committee, or in the event no such committee existed, to the largest 20 creditors of KMART. (Findings of Fact a p. 2). On January 25, 2002, the bankruptcy court entered an order approving the Rejection Motion by which time the Master Leases and Subleases had been moved to Schedule B. (Findings of Fact at p. 4). The January 25, 2002 order approved the rejection of the Master Leases and Subleases and no further permission from or order from the bankruptcy court was required for KMART to reject the Master Leases and Subleases. (Rubloff R. 3)

4

KMART's rejection of the Master Leases would have had a domino effect on the Subleases, the Sub-Subleases and the Subleasehold Mortgages. (Rubloff R.23 at p. 26). If KMART rejected the Master Leases, RUBLOFF's interest in the Demised Premises would cease. (*Id.*). RUBLOFF would be unable to fulfill its obligations under the existing Sub-Subleases and the secured interests that RUBLOFF's lenders held pursuant to the Subleasehold Mortgages would cease to exist. (*Id.* at p. 26). RUBLOFF's damage claims against KMART under such a scenario would not have been limited to the rent spread between the Master Leases and Subleases currently claimed, but also would have included substantial claims for RUBLOFF's inability to perform under the Sub-Subleases and the loss of the Subleasehold Mortgages. (*Id.* at p. 26). KMART also would be faced with the Master Landlords' lease rejection claims. (*Id.* at p. 26).

RUBLOFF immediately contacted KMART upon receiving KMART's Rejection Motion to ascertain KMART's intentions concerning the Master Leases. (*Id.* at 23-24). KMART made it clear to RUBLOFF that KMART intended to reject the Master Leases, without regard to KMART's obligations to RUBLOFF under the Subleases. (Findings of Fact at p. 3). KMART would not agree to move the Master Leases and Subleases from Schedule A to Schedule B of the Rejection Motion unless RUBLOFF agreed to cover all of KMART's contractual liabilities under the Master Leases from January 22, 2002, through either the date of assumption or the date of rejection. (Findings of Fact at p. 4). KMART made it clear on January 23, 2002, and in subsequent communications between KMART representatives and RUBLOFF representatives that it was KMART's intention, in the absence of coming to a satisfactory agreement regarding assumption and assignment, to seek the rejection of the Master Leases and Subleases, (Rubloff

70549966v3 810787

R.16 at p. 9; Rubloff R. 23 at p. 28), approval of which KMART actually obtained on January 25, 2002. (Rubloff R. 3)

In an attempt to mitigate its damages from KMART's breach and repudiation of the Subleases, RUBLOFF was forced to obtain an assignment of KMART's rights in the Demised Premises under the Master Leases. After negotiations, RUBLOFF and KMART entered into an Assignment and Assumption Agreement dated as of February 1, 2002 (the "Assignment and Assumption Agreement") (Rubloff R.12), whereby KMART agreed to assume and assign the Master Leases to RUBLOFF. (Findings of Fact at p. 4). The bankruptcy court approved the Assignment and Assumption Agreement by orders dated February 15, 2002; March 25, 2002; May 1, 2002; and July 18, 2002. (Rubloff R.5; Findings of Fact at p. 4). By assuming KMART's interest in the Master Leases, RUBLOFF became obligated to pay the base rents under the Master Leases to the Master Landlords. (Rubloff R.12). By the terms of the Assignment and Assumption Agreement, RUBLOFF was required to cure all of KMART's pre-petition and post-petition defaults under the Master Leases and to release and hold KMART harmless from all of its obligations under the Master Leases. (Rubloff R.12). RUBLOFF did not release or agree to hold KMART harmless from any of its obligations under the Subleases. (Rubloff R.23 at p. 39-46).

RUBLOFF's efforts to mitigate its damages afforded KMART the opportunity to substantially reduce the claim amounts against KMART's estate related to the properties. (Rubloff R.16 at p. 10). Having decided that these properties "constitute an unnecessary drain on the debtor's cash resources" (Rubloff R.8 at p. 222) and that it was in the best interests of the estate to reject the leases, (Rubloff R.8 at p. 219) KMART had already made the decision to reject the Master Leases and Subleases and thereby subject KMART's estate to the upstream

6

claims of the Master Landlords under the Master Leases, and the downstream claims of RUBLOFF under the Subleases. (Findings of Fact at p. 5).   Through RUBLOFF's efforts, KMART's estate was greatly benefited by its avoidance of the upstream claims of the Master Landlords, and by the substantial reduction of the downstream claims of RUBLOFF. RUBLOFF's claims were reduced to the rent spread between the Master Leases and the Subleases, and the estate avoided RUBLOFF's additional claims for the loss of the Sub-Subleases and Subleasehold Mortgage interests. (Findings of Fact at p. 6)

On July 29, 2002, RUBLOFF filed the Claims. (Findings of Fact at p. 5; Rubloff R.1). The amount of each of the Claims is based on the difference between the respective amounts of rent now payable by RUBLOFF to the Master Landlords under the Master Leases (assumed by KMART and assigned to RUBLOFF) and the respective amounts that were originally payable by RUBLOFF to KMART under the Subleases for each of the Demised Premises. (Findings of Fact at p. 6).   RUBLOFF's aggregate claims under its Claims are $28,660,212.21. (Findings of Fact at p. 5; Rubloff R.1).

KMART filed its objections to the Claims on February 2, 2004 as part of a Twentieth Omnibus Claims Objection. (Findings of Fact at p. 6; Rubloff R.6).   RUBLOFF responded on March 5, 2004. (Rubloff R.7).   Subsequently, the parties filed cross motions for summary judgment.   After briefing and argument, the bankruptcy court on December 6, 2006, entered its oral decision denying the cross motions for summary judgment and subsequently entered a scheduling order for a trial on KMART's objections to RUBLOFF's Claims. (Findings of Fact at p. 6).   An evidentiary hearing was held at which time RUBLOFF and KMART asked the bankruptcy court to rule upon whether the RUBLOFF Claims could be allowed before reaching a determination of the amount. (Findings of Fact at p. 6).   On November 20, 2007, the Honorable

70549966v3 810787

Judge Susan Sonderby entered an Order disallowing the RUBLOFF Claims. (Rubloff R.21).  At

that time, Judge Sonderby also entered Findings of Fact and Conclusions of Law. (Rubloff R.22).

## VI.    ARGUMENT

### A.    Standard of Review.

The trial court's findings of fact are reviewed for clear error and any other conclusions of

law are reviewed *de novo*, as are mixed questions of law and fact.  *Mungo v. Taylor*, 355 F.3d

969, 974 (7th Cir. 2004); *Golant v. Care Comm, Inc.*, 216 B.R. 248, 252 (N.D.Ill. 1997);

*Leibowitz v. Parkway Bank & Trust Co.*, 210 B.R. 298, 301 (N.D.Ill. 1997).  The bankruptcy

court's finding that KMART did not anticipatorily repudiate its obligations under the Subleases

is a conclusion of law which is reviewed *de novo*.  The bankruptcy court's conclusion that the

terms "Lease" and "Leases" in the Assignment and Assumption Agreement refers to both the

Master Leases and Subleases and that RUBLOFF therefore waived any claims which it may have

had against KMART is a mixed question of law and fact and is, therefore, reviewed *de novo*.  *Id.*

The bankruptcy court's conclusion that RUBLOFF waived its right to the Claims through the

Assignment and Assumption Agreement is a conclusion of law and should be reviewed *de novo*.

### B.    The bankruptcy court erroneously concluded that KMART did not anticipatorily repudiate its obligations under the Subleases.

In its decision, the bankruptcy court ignored the undisputed statements and actions of

KMART and found that KMART did not anticipatorily repudiate its obligations under the

Subleases.  Ultimately, undisputed statements and actions of KMART should have led the

Bankruptcy Court to conclude that KMART did indeed anticipatorily repudiate its obligations

under the Subleases.

Illinois and Michigan law apply to this case as the Demised Properties are located in

Illinois and Michigan.  Under Illinois and Michigan law, anticipatory breach of a contract occurs

8

when the repudiating party manifests an intent that it will not render performance under the contract. *Kenisoft Development Corp. v. Softbank Holdings, Inc.*, 139 F.Supp.2d. 869 (N.D. Ill. 2001); *Paul v. Bogle*, 193 Mich.App. 479, 493; 484 N.W.2d 728 (Mich.App. 1992). "Announcement by the other party that he has no intention of paying should entitle the prospective victim of the payer's breach to take immediate step to protect his interest, ..." *Central States SE and SW Pension Fund v. Basic American Industries, Inc.*, 252 F.3d 911, 915 (7th Cir. 2001); *Stanton v. Dachille*, 186 Mich.App. 247, 252; 463 N.W.2d 479 (Mich.App. 1990). When a party repudiates a contract, the non-breaching party is not required to tender performance or to comply with conditions precedent. *Builders Concrete Company of Morton Grove v. Fred Faubel and Sons, Inc.*, 58 Ill.App.3d 100 (3rd Dist. 1978); *Stoddard Manufactures National Bank of Grand Rapids*, 593 N.W.2d 630 (Michigan Appellate Court 1999). There is no necessity in such case for a tender of performance, or compliance with conditions precedent, or waiting for the time of performance to arrive. *Builders Concrete* at 105.

Leases may be anticipatorily breached just as any other contracts. *Jim-Bob, Inc. v. Mehling,* 178 Mich.App.71, 443 N.W.2d 451 (Mich.App. 1989); *Vozza v. Garrow*, 1999 WL 33435364 (Mich.App.1999); *Leo v. Pearce Stores Company*, 57 F.2d 340, 341 (E.D.Mi. 1932); *Keep Productions Inc. v. Arlington Park Towers Hotel Corporation,* 49 Ill.App.3d 258, 264-265, 364 N.E.2d 939, 944 (1st Dist. 1977). An exception to this general rule exists in a situation where a lessor is seeking future rents from a lessee. *Id.* That is not the case with RUBLOFF's Claims. RUBLOFF is not seeking future rents from KMART under the Subleases. RUBLOFF is seeking damages flowing from KMART's anticipatory repudiation of the Subleases when KMART unequivocally stated it would not fulfill its obligation under the Subleases to maintain

9

the Master Leases in full force and effect. RUBLOFF's damages flow directly from KMART's breach.

On the same day KMART filed its Chapter 11 bankruptcy proceeding, KMART also filed a motion to reject over 300 real property leases. (Findings of Fact at p. 2). The motion requested court approval for the immediate rejection, effective January 22, 2002, for those leases on Schedule A to the motion. (*Id.* at p. 2; Rubloff R. 2). The motion also requested the bankruptcy court to approve the rejection of additional leases set forth on Schedule B as determined solely by KMART and subject only to KMART sending out a ten day notice to the affected party and the unsecured creditors committee (if no committee had been formed, the notice was to go to the 20 largest creditors). (Findings of Fact at p. 2,3). Six of the eight Master Leases and Subleases related to the Claims were on Schedule A to the motion. (*Id.* at p.3). Pursuant to a temporary agreement reached between RUBLOFF and KMART, the Master Leases and Subleases involving RUBLOFF were moved from Schedule A to Schedule B. (*Id.* at p.4). As a condition precedent to KMART's agreement to move the Master Leases and Subleases from Schedule A to Schedule B, RUBLOFF was forced to agree that it would cover all of KMART's obligations under the Master Leases from January 22, 2002, through either the date the Master Leases were rejected or until the Master Leases were assumed and assigned by KMART to RUBLOFF. (*Id.* at p. 4). On January 25, 2002, the bankruptcy court approved the rejection by KMART of the Master Leases. As a result, as of January 25, 2002, the bankruptcy court had approved the rejection of the Master Leases and no further order of the bankruptcy court was required for KMART to reject these Master Leases. (*Id.* at p.4). Therefore, not only did KMART file a motion to reject the Master Leases, but KMART actually obtained bankruptcy court approval to

10

reject the Master Leases and no further approval by the bankruptcy court or even any kind of notice to the bankruptcy court was required. (Rubloff R. 3).

While RUBLOFF acknowledges that the mere filing of the bankruptcy alone is not enough to establish KMART's anticipatory repudiation, there are several other facts which should have led the bankruptcy court to the conclusion that KMART anticipatorily repudiated its obligations under the Subleases, including:

i.     Statements made by KMART's representatives to RUBLOFF's representatives that KMART would not entertain any discussions with RUBLOFF about moving the Master Leases and Subleases from Schedule A to Schedule B of the Rejection Motion unless RUBLOFF agreed to be responsible for all of KMART's financial obligations under the Master Leases from January 22, 2002 until the earlier of the assumption and assignment of the Master Leases by KMART to RUBLOFF or the rejection of the Master Leases. (Findings of Fact at p. 4; Rubloff R. 16 at p. 8).

ii.    Statements made by KMART in its Motion to Reject filed with the bankruptcy court on January 22, 2002, that the leases that were the subject of the Motion were of no economic value to KMART and were a drain on KMART's cash resources. (Rubloff R. 2 at p. 8).

iii.   Representations made to the bankruptcy court and to RUBLOFF in Mr. Conaway's (the then CEO of KMART) Affidavit in Support of the Rejection Motion that both KMART and its real estate advisor, Rockwood Gemini Advisors, had reviewed the leases which were the subject matter of the Motion, which includes the Master Leases and Subleases that were on Schedule A, and that those leases had no economic value to KMART and were a drain on KMART's cash resources. (Rubloff R. 14)

iv.    Statements made by Mr. Bell of KMART's real estate department to Mr. Robinson that the analysis as to the Master Leases with RUBLOFF had been completed and KMART was absolutely going to reject all the Master Leases . (Rubloff R. 23 at p. 28-31; Rubloff R. 16 at p. 9).

v.     Statements by Mr. Bell to Mr. Robinson that KMART's real estate consultants, Rockwood Gemini Advisors, had taken over the lease analysis process and had determined which leases were profitable and unprofitable to KMART, and which leases were to be rejected. (Rubloff R. 2 at par. 17; Rubloff R. 23 at p. 29).

vi.    Statements by Mr. Bell to Mr. Robinson that KMART was going to reject the Master Leases and Subleases, and that there was no way for RUBLOFF to maintain the Master Leases in place. (Rubloff R. 16 at p.9; Rubloff R. 23 at p. 28-31; Findings of Fact at p.3).

11

vii.    Statements made by Mr. Bell to Mr. Robinson confirming that Larry Keller, Mr. Bell's boss and the head of the KMART real estate group at the time, and Rockwood Gemini Advisors, had confirmed that KMART was going to live by the analysis that Rockwood Gemini Advisors had done on the Master Leases and Sublease and that they were going to be rejected. (Rubloff R. 2 at par 17; Rubloff R. 23 at p. 24; Findings of Fact at p.3).

viii.    The common sense analysis, as acknowledged to the bankruptcy court by KMART's counsel on May 14, 2007, that for KMART to assume the Master Leases and Subleases would make no economic sense for KMART as it would have cost KMART in excess of $28 million over the life of the Master Leases. As a result, common sense dictates that the only scenario under which KMART would not reject both the Master Leases and the Subleases is what happened here.

ix.    Due to the unique nature of the sublandlord/subtenant relationship found to exist between KMART and RUBLOFF, RUBLOFF did not have the same protections normally afforded to a tenant facing a motion to reject a lease by a landlord in a Chapter 11 proceeding (*See* 11 U.S.C. Sec. 365 (h)(1)(A) that provides upon rejection, a tenant can either treat the lease as terminated or maintain its rights under the lease for the balance of the lease term). If the Master Leases were rejected in this situation, RUBLOFF would have lost its right to possession and would have defaulted on more than $12,000,000.00 of subleasehold mortgages on which it was obligated and defaulted on sub-subleases it had had with sub-subtenants at all of the locations.

x.    KMART's requirement that RUBLOFF enter into the Lease Assignment and Assumption Agreement as a condition precedent to KMART's not rejecting the Master Leases. (Findings of Fact at p. 4; Rubloff R. 16 at p. 8).

xi.    The entry of the January 25, 2002 Order that approved the rejection of the Master Leases and Subleases and gave KMART the unfettered right to reject the Master Leases and Subleases and KMART has stipulated to the fact that in the absence of the Lease Assignment and Assumption Agreement, it would have rejected the Master Leases and Subleases. (Findings of Fact at p. 4; Rubloff R. 3).

As the bankruptcy court previously found, given the economic reality of this particular fact situation and the legal relationship between KMART as sublandlord and RUBLOFF as subtenant, there cannot be any reasonable doubt that the bankruptcy court would grant KMART's Rejection Motion on January 25, 2002, with the Master Leases and Subleases on Schedule A had an interim agreement not been reached between KMART and RUBLOFF. RUBLOFF was not required to fall on the sword to preserve its Claims, claims which would

12

70549966v3 810787

have been much higher had RUBLOFF not assumed KMART's obligations under the Master Leases.

As a result, the bankruptcy court should have concluded that as a matter of law, KMART made clear and unequivocable statements, in addition to the filing of the Motion to Reject the Master Leases, that it would not fulfill its obligations under the Subleases to maintain the Master Leases in full force and effect as required by the express provisions of Paragraph 31 of the Subleases, and as required by the implied covenant of good faith and fair dealing and the covenant of quiet enjoyment which applied to the Subleases. (Findings of Fact at p. 5). (Rubloff R. 3). As a result, KMART anticipatorily repudiated the Subleases prior to February 1, 2002. *See Kenisoft Development Corp. v. Softbank Holdings, Inc.*, 139 F.Supp. 869 (N.D. Ill. 2001); *Paul v. Bogle*, 193 Mich.App. 479, 493; 484 N.W.2d 728 (Mich.App. 1992). The actions of KMART to reject the Master Leases and Subleases was consistent with the testimony, stipulations and exhibits reflect the economic imbalance between what KMART was obligated to pay under the Master Leases and what KMART was to receive under the Subleases. (Findings of Fact at p. 6).

The only reason KMART did not immediately reject the Master Leases was because RUBLOFF's assumption of the Master Leases would eliminate the rejection claims of the Master Landlords against KMART. KMART's rejection of the Master Leases would have increased, not decreased, the amount of claims against KMART. (Findings of Fact at p. 6). If as a matter of law a repudiation only can occur upon rejection of a master lease, then a subtenant forfeits any opportunity to protect its interest (and those of its sub-subtenants and subleasehold lenders) in the demised premises.

13

It is also important to note the Bankruptcy Code does not afford the protections to a subtenant when a sublandlord files for bankruptcy that are afforded to a tenant when a landlord files for bankruptcy. When a bankrupt landlord rejects a lease, the tenant can either treat the lease as terminated by its rejection or the tenant may retain its rights under the lease for the balance of the lease term, thus preserving tenant's use and occupancy rights to the demised premises. 11 USC 365(h)(1)(A). As acknowledged by the bankruptcy court in its footnote on page 12 of its decision, unlike the rights of a tenant when a landlord files for bankruptcy, under the Bankruptcy Code a subtenant has no right to continued possession under the sublease once the master lease or sublease is rejected.

A subtenant should not have had to wait for the entry of an order rejecting a master lease before a debtor is deemed to have repudiated its obligations under a sublease. This is a bad policy that would lead to a dramatic increase in the amount of claims against a debtor's estate. If a subtenant were unable to gain control of KMART's interest in a master lease and avoid the rejection of the master lease, then instead of there being only the subtenant's claim for the rent difference between the master lease and the sublease, the master landlord would have its own claims against the estate, and the subtenant's claim would not be limited to the spread between the rents payable under the master lease and the sublease, but would also include the subtenant's claims for damages resulting from the loss of the interests of the sub-subtenants and subleasehold lenders. These claims could easily be a multiple of the underlying claims of a master landlord were the master lease simply rejected.

Indeed, the only real protection to a subtenant (especially a subtenant that has sub-subleased the demised premises to others and has granted subleasehold mortgages to its lenders) when a bankrupt sublandlord repudiates a master lease is for the subtenant to try to gain control

14

70549966v3 810787

of the sublandlord's interest in the master leases before they are rejected. That is exactly what RUBLOFF did in this case.

Despite all of the above-referenced facts and law, the bankruptcy court erroneously concluded that KMART did not anticipatorily repudiate its obligations under the Subleases relying primarily on the provisions of §365 of the United States Bankruptcy Code. In particular, the bankruptcy court found that if KMART could repudiate the Subleases by the above-referenced actions, such would render §365 of the United States Bankruptcy Code meaningless. In short, the bankruptcy court erroneously concluded the above-referenced actions of KMART did not amount to anticipatorily repudiation because §365 of the United States Bankruptcy Code provides that a lease is not effectively rejected until such time as that rejection is approved by the bankruptcy court. However, the bankruptcy court ignores the fact that the bankruptcy court had already entered an order granting the Motion to Reject the Master Leases. (Rubloff R.2, 3, 9, and 10).

Through its Order approving the rejection of the Master Leases, the bankruptcy court gave KMART the authority to reject the Master Leases upon ten (10) days notice without any further court action. (Rubloff R.3). Because that ten (10) day notice was required under the Order, the bankruptcy court concluded that absent providing that notice, no repudiation could have occurred. However, the bankruptcy court's conclusion in that regard completely ignores the well recognized and applicable doctrine of anticipatory repudiation. Under the bankruptcy court's analysis, there could not be any effective anticipatory repudiation of a lease or executory contract until the lease or executory contract is actually rejected rendering the doctrine of anticipatory repudiation meaningless as once the lease or executory contract in question is rejected, it is not an anticipatory breach, but an actual breach. The lease or executory contract is

15

rejected.  This is contrary to the Seventh Circuit' holding in *Central States, Southeast and Southwest Areas Pension Fund v. Basic American Industries, Inc.* which involved a debtor in bankruptcy wherein the Court held that the doctrine of anticipatory breach applies when it is "reasonably certain that the other party is not going to meet its obligations". *Central States,* 252 F3d 911, 919 (7th Cir. 2001)  The court also stated: "{I}f the trustee or debtor in possession exercises the discretion that the Code gives him to reject the contract, that of course is repudiation." *Central States,* 252 F3d 911, 916 (7th Cir. 2001)  KMART exercised that discretion when it filed the Rejection Motion.  In addition, in this case, the bankruptcy court entered an order approving the Rejection Motion. The bankruptcy court found that KMART, by its actions, statements and even the with the entry of order entered by the bankruptcy court approving KMART's Rejection Motion, did not anticipatorily repudiate the Subleases.  In effect, the bankruptcy court held that until the lease or executory contract is actually rejected, there can be no anticipatory repudiation.  This analysis, in effect eliminates the doctrine of anticipatory repudiation in relation to leases and executory contracts subject to Sec. 365 of the Bankruptcy Code.  The Bankruptcy Code does not eliminate the doctrine of anticipatory repudiation.

If a lease or executory contract is rejected, it is no longer an issue of anticipatory repudiation.  In this case, the Master Leases were not rejected unless and until KMART actually provided the ten-day notice of rejection.  While it is true that ten-day notice was not provided, the only reason that ten-day notice was not provided was because ultimately RUBLOFF and KMART were able to reach an agreement which took the form of the Assignment and Assumption of the Master Leases. (Rubloff R.12).  If Rubloff had not agreed to the Assignment and Assumption Agreement, KMART readily admits it would have sent the ten-day notice and

16

rejected the Master Leases. All of the above-referenced statements and actions of KMART show that KMART's rejection of the Master Leases was a foregone conclusion.

Ultimately, in order to fall within the bounds of anticipatory repudiation, the evidence need only show that the repudiating party has manifested an intent that it will not render performance under the contract. *Kenisoft Development Corp. v. Softbank Holdings, Inc.*, 139 F.Supp. 869 (N.D.Ill. 2001); *Paul v. Bogle*, 193 Mich.App. 479, 493, 484 N.W.2d 728 (Mich.App. 1992). Certainly all of the above-referenced statements and actions of KMART are sufficient to show that KMART had no intention of fulfilling its obligations under the Subleases and intended to reject the Master Leases but for the eleventh hour agreement with RUBLOFF. The decision to send the notice was strictly KMART's. No further approval or notice to the bankruptcy court was required. The January 25, 2002, order was a final order and nothing within the order provided any creditor with the right to object to KMART's rejection of any lease on Schedule B. The facts, contrary to the bankruptcy court's conclusion, are sufficient to constitute anticipatory repudiation by KMART of the Subleases.

As previously stated, RUBLOFF does not contend that the mere filing of the bankruptcy petition amounts to anticipatory repudiation. What RUBLOFF is stating is that when you take the filing of the bankruptcy, the filing of the Motion to Reject the Master Leases and the Subleases together with all of the other statements and actions by KMART (See Page No. 8 through 13 *infra*), that those actions amount to clear and unequivocal statements that KMART was not going to fulfill its obligations under the Master Leases. The bankruptcy court held that despite all of that, it still cannot be anticipatory repudiation until such time as the bankruptcy court entered an order approving the rejection of the Master Leases. Even assuming *arguendo* that that is correct, as previously stated, that order was entered on January 25, 2002 and with

17

KMART being clear of the necessity of any further court authority and the court having approved KMART's ability to reject the Leases, that that is the date at the very latest which KMART anticipatorily repudiated the Leases. Upon the anticipatory repudiation, RUBLOFF was free to take steps to protect its interest. The damages for KMART's anticipatory repudiation accrued, at the very latest, on January 25, 2002. The Assignment and Assumption Agreement was an effort by RUBLOFF to mitigate the damages.

After KMART breached the Subleases, RUBLOFF took "immediate steps to protect itself" by obtaining control of KMART's interests in the Master Leases. Anticipatory repudiation does not require the victim to wait around and make sure the breaching party does what it states it will do. *Central States SE and SW Pension Fund* at page 915; *Stanton* at page 252. Rather, in such instances, the non-breaching party is entitled to take steps to protect itself, as RUBLOFF did here. A party is not required to object or to attempt to keep a contract in force once it has been repudiated by the other party. *Builders Concrete* at 105. RUBLOFF was entitled to rely on KMART's statements and acts and was not required to object or keep the Subleases in force.

In immediately taking steps to protect itself, RUBLOFF mitigated its damages by obtaining control of KMART's interests in the Master Leases. This assured RUBLOFF of the continuing right to use and occupy the Demised Premises, and allowed RUBLOFF to live up to its obligations to its Sub-Subtenants under the Sub-Subleases and to its lenders under the Subleasehold Mortgages.

18

RUBLOFF's failure to intervene prior to KMART's rejection of the Master Leases would have foreclosed RUBLOFF's ability to mitigate its damages and would have precluded RUBLOFF from protecting its interest in the Demised Premises.

Because KMART repudiated its obligations under the Subleases, RUBLOFF should have been entitled to damages therefrom by way of the Claims. A repudiation of a contract before the time for performance, which amounts to a refusal to perform it at any time, gives the adverse party the option to treat the entire contract as broken and to sue immediately for damages as for a total breach. The damages that are measured are those costs and expenses incurred by RUBLOFF arising out of KMART's breach and repudiation of Subleases. *Bowman v. Zimmy*, 256 Ill.App.3d 386, 390, 628 N.E.2d. 384 (1st Dist. 1993). RUBLOFF's damages accrued at the time of KMART's breach, and consist of the spread between the rents payable by RUBLOFF under the Subleases and the amounts payable by KMART under the Master Leases. This amount is $28,660,212.21 plus the amount paid by RUBLOFF to cure KMART's defaults under the Master Leases.

Although the non-breaching party is not required to tender performance (See *Builders Concrete* at 105), RUBLOFF demonstrated at trial that it was ready, willing and able to perform all of its obligations under the Subleases. (Rubloff R. 23 at p. 48). In fact, there is a finding by the bankruptcy court in each of the Orders approving the Assignment and Assumption Agreement that RUBLOFF provided adequate assurances of future performance under the Master Leases to each of the Master Landlords. (Rubloff R. 5).

In all, the bankruptcy court should have concluded based upon the undisputed statements and actions of KMART that KMART repudiated its obligations under the Subleases and that though RUBLOFF mitigated its damages through the Assignment and Assumption Agreement,

19.

RUBLOFF is entitled to damages in the form of the Claims for the difference in the spread between the rents payable by RUBLOFF under the Subleases and the amounts payable by KMART under the Master Leases.

**C.    The bankruptcy court erroneously concluded that RUBLOFF agreed to assume all of KMART's obligations under the Subleases and to hold KMART harmless from claims and damages under the Subleases.**

The bankruptcy court also erroneously concluded that the Assignment and Assumption Agreement was ambiguous regarding whether or not the Subleases were intended to be included in the term "Lease" or "Leases". The bankruptcy court erroneously found that based upon the email correspondence between counsel for KMART and counsel for RUBLOFF that the Subleases were a part of the Assignment and Assumption Agreement. The bankruptcy court's incorrect conclusion that the term "Leases" in the Assignment and Assumption Agreement led the bankruptcy court to also incorrectly conclude that because RUBLOFF agreed under the Assignment and Assumption Agreement to assume the obligations of KMART under the "Leases", RUBLOFF's right to pursue the Claims was eliminated. (Rubloff R. 22 at p. 15). Further, the bankruptcy court's incorrect conclusion that the term "Leases" in the Assignment and Assumption Agreement includes the Subleases also incorrectly led the bankruptcy court to conclude that because the Assignment and Assumption Agreement provides that RUBLOFF will hold KMART harmless from all claims and damages "arising in connection with the Leases", RUBLOFF cannot recover under the Claims because RUBLOFF agreed to hold KMART harmless under the Subleases. (Rubloff R. 22 at p. 15). Since the term "Leases" does not include Subleases, there was no agreement to hold KMART harmless under the Subleases.

The holding of the bankruptcy court that the term "Leases" in the Assignment and Assumption Agreement includes the Subleases is incorrect for two reasons. First, when reading the Agreement as a whole, the contract is not ambiguous and the terms "Lease" and "Leases" do

20

70549966v3 810787

not include the Subleases, but rather such terms are limited to the Master Leases. Second, even if the bankruptcy court correctly determined that the contract is ambiguous, that ambiguity should have been held against the drafter of the document, which was KMART (Rubloff R. 23 at p. 55), and should have led the bankruptcy court to the conclusion that the Subleases were not included in the Assignment and Assumption Agreement. *Thomas v. Pearl Vision*, 251 F.3d 1132 (7th Cir. 2001); *Wilkie v. Auto-Owners Insurance Company*, 469 Mich. 41, 61 (2003).

In its ruling, the bankruptcy court found the language of the contract ambiguous and it was not clear on its face whether the term "Lease" and "Leases" referred to just the Master Leases or the Master Leases and the Subleases. In so finding, the bankruptcy court relied upon the language in the First "WHEREAS" clause in the Assignment and Assumption Agreement which states:

> "WHEREAS, Assignor entered into certain leases more particularly described in Schedule 1 attached hereto and made a part hereof (as the same may have been amended, supplemented or extended from time to time, and together with any and all other leases or agreements affecting the Premises (hereinafter defined), (individually, a "Lease" and collectively, the "Leases"), whereby Assignor leased from the landlord set forth in Schedule 1 certain real property more particularly described in Schedule 1 and in the Leases (collectively, the "Premises"); and (Rubloff R. 12 at p. 1).

In short, the bankruptcy court concluded that because the words "together with any and all other leases" in the first "WHEREAS" could be read to include the Subleases and the language "whereby Assignor [KMART] leases from the landlord" could be read to exclude the Subleases, the Assignment and Assumption Agreement is ambiguous. (Rubloff R. 22 at p. 15). However, even this paragraph is not ambiguous for it is only the Master Leases that are listed on Schedule 1 to the Assignment and Assumption Agreement to which the "Leases" were attached. (Rubloff R. 12).

21

The bankruptcy court failed to examine the remainder of the Assignment and Assumption Agreement which has several other sections which demonstrate why the terms "Lease" and "Leases" as used in the Assignment and Assumption Agreement must refer to the Master Leases. In its interpretation of the term "Leases", the bankruptcy court ignored the fact that in Paragraph 9 of the Assignment and Assumption Agreement, the term "Subleases" is a defined term and identified as those subleases "more particularly described on Schedule 2 attached hereto." (Rubloff R. 12). Schedule 2 of the Lease Assignment and Assumption Agreement is a list of the Subleases and said Subleases were not included in Schedule 1. (Rubloff R. 12). The bankruptcy court's interpretation also ignores the clear delineation and difference acknowledged in the Lease Assignment and Assumption Agreement between the "Leases" and "Subleases". Paragraph 3 of the Lease Assignment and Assumption Agreement provides as follows:

> "Assumption of Leasehold Obligations. Assignee hereby accepts the foregoing assignment and covenants with Assignor, that, on and after the Assignment Date, Assignee and its successors and assigns hereby assume and agree to keep, perform, fulfill or cause to be performed all of the terms, covenants, conditions and obligations contained in the Leases, which, by the respective terms therein, are imposed upon Assignor, as tenant, including, without limitations, the payment of any and all rents due thereunder; provided, however, notwithstanding the foregoing, (i) Assignee shall reimburse Assignor for any and all base rents and costs and expenses incurred by Assignor under the Leases from and after January 22, 2002 to the Assignment Date and (ii) Assignee shall have no obligation to make any payments to Assignor under the Subleases (as hereinafter defined) for any and all base rents and costs and expenses incurred or due under the Subleases from and after January 22, 2002 to the Assignment Date." (Rubloff R. 12).

When not viewed in isolation in the first "WHEREAS" clause, but when viewed in context and how the term is used throughout the contract, (see *Utility Audit, Inc. v. Horace Mann Service Corp.*, 383 F.3d 683 (7th Cir. 2004)) there can be no argument that the term "Leases" refers to any leases other than the Master Leases. Paragraph 3 set forth above, which is

22

RUBLOFF's core agreement to assume KMART's obligations under the Master Leases, obligated RUBLOFF to assume KMART's obligations "as tenant, including the payment of any and all rents due thereunder". (Rubloff R. 12). If the term "Leases" included the Subleases, then this provision would be rendered meaningless as KMART was not the tenant and did not pay rents under the Subleases. The term "Subleases" is a separately defined term in the Lease Assignment and Assumption Agreement. Furthermore, Roman Numerette (i) of Paragraph 3 requires that RUBLOFF reimburse KMART for any and all base rent and costs incurred by assignor under the "Leases" from and after January 22, 2002. Obviously, in that context, the term "Leases" can only mean the Master Leases since it was impossible for KMART to incur any base rents or costs under the Subleases. For all of those reasons, the bankruptcy court was wrong when it concluded that the terms "Lease" and "Leases" in the Assignment and Assumption Agreement includes the Subleases.

Also contrary to the bankruptcy courts finding, Article 27 of the Subleases does not provide a safe haven for KMART's prior breach of the Subleases. As set forth above, RUBLOFF's claims for KMART's anticipatory breach of the Subleases accrued, at the latest, on January 25, 2002, when the Court entered the order approving the rejection of the Master Leases. As of that date, no further order or action of the Court was required for KMART to reject the Master Leases and KMART's definitive, unequivocal statements to RUBLOFF that it would not perform its obligations under the Master Leases was a clear repudiation of KMART's duties under the Subleases. See *Kenisoft Development Corp. v. Softbank Holdings, Inc.*, 139 F.Supp. 869 (N.D.Ill. 2001); *Paul v. Bogle*, 193 Mich.App. 479, 493; 484 N.W.2d 728 (Mich.App. 1992). The measure of damages for breach of contract is the amount it will take to put the non-breaching party in the same position it would have been absent the breach or the damages that

23

were caused by the breach. Here, that amount is the rent spread between the Master Leases and the Subleases.

Upon KMART's repudiation of its obligations under the Subleases, RUBLOFF's damages accrued and RUBLOFF was entitled to take immediate steps to protect its interest. See *Central States SE and SW Pension Fund v. Basic American Industries, Inc.*, 252 F.3d 911, 915 (7th Cir. 2001); *Stanton v. Dachille*, 186 Mich.App. 247, 252; 463 N.W.2d 479 (Mich.App. 1990). Thus, RUBLOFF's damage claim accrued and the amount fixed no later than January 25, 2002. Article 27 of the Subleases does not release KMART from claims which arose prior to the assignment of the Master Leases to RUBLOFF.

As a result, the bankruptcy court was incorrect when it concluded that the Assignment and Assumption Agreement was ambiguous as it should have concluded that under the plain language of that Agreement that the terms "Lease" and "Leases" do not include the Subleases. Further, the bankruptcy court was also incorrect in concluding that Article 27 of the Subleases releases KMART from the Claims. As a result, as a matter of law the bankruptcy court should have concluded that RUBLOFF did not assume the obligations of KMART under the Subleases, did not agree to hold KMART harmless under the Subleases, and did not release KMART from its obligations under the Subleases.

**D.    Even if the bankruptcy court correctly concluded that the Assignment and Assumption Agreement was ambiguous, the agreement should have still found that the term "Leases" referred solely to the Master Leases**

Assuming *arguendo,* that the bankruptcy court correctly concluded that the Assignment and Assumption Agreement is ambiguous, the bankruptcy court should have construed it against the drafter, which was KMART, and looked at the parol evidence and concluded that the term "Lease" and "Leases" refers solely to the Master Leases. If an ambiguity in a contract exists, a court may look to parol evidence to interpret a contract's meaning. *Asad v. Hartford Insurance*

24

*Co.*, 116 F.Supp.2d 960 (N.D. Ill. 2000); *Klapp v. United Insurance Group Agency, Inc.*, 468

Mich. 459, 470 (2003).  In construing an ambiguity, a court may also look to other extrinsic

evidence as to prior and contemporaneous transactions and facts to ascertain the intent of the

parties. *Chemetall GMBH v. ZR Energy, Inc.*, 320 F3d 714 (7th Cir. 2003). The resolution of the

ambiguity becomes a question of fact to be determined by the trier of fact. *North Shore Gas Co.*

*v. Salomon*, 152 F.3d 642 (7th Cir. 1998); *Klapp* at 470-471.  Any ambiguity is to be resolved

against the drafter.  *Thomas v. Pearl Vision*, 251 F.3d 1132 (7th Cir. 2001); *Wilkie v. Auto-*

*Owners Insurance Company*, 469 Mich. 41, 61 (2003).

 The Assignment and Assumption Agreement was drafted by KMART.  (Rubloff R. 23 at

p. 55).  Related documents, also all drafted by KMART, clearly reflect that the "Leases" which

KMART assumed and assigned to RUBLOFF were solely the Master Leases.  In the Motion for

Approval of the assumption and assignment of the Master Leases which was drafted by

KMART, the Motion defines the Master Leases as "Real Property Leases".  (Rubloff R. 23 at

p.55; Rubloff R. 4).  For instance, this is made clear in Paragraph 15 of said Motion when

KMART states:

> "Moreover, the Debtors have determined, with the assistance of
> RGH, that the rental obligations under the Real Property Leases
> are at or above market.  Thus, the Debtors do not believe there is
> any value in the Leases.  Indeed, the lack of such value is
> evidenced in part by the fact that Assignee's rent is less than that
> under the Real Property Leases." (Rubloff R. 4 at p.6)

It is clear from reading in the context of the Motion drafted by KMART that the Lease

Assignment and Assumption Agreement involved only the assumption and assignment of the

Master Leases as this paragraph would make no sense if the "Real Property Leases" included the

Subleases.  RUBLOFF (the Assignee in the Assignment and Assumption Agreement) could not

have rent which is less than what is due under the Subleases because the amount of rent due from

RUBLOFF is set under the Subleases themselves. Whether you call it "Leases" in the Assignment and Assumption Agreement or "Real Property Leases" as in the Motion, both terms refer solely to the Master Leases.

If that record is not sufficient to establish the true meaning of the word "Leases" and clarify any ambiguities, then one only needs to look to the subsequent Orders entered by the bankruptcy court. In an Order entered by the bankruptcy court on February 15, 2002, the following language was utilized:

> "1.    Proposed assumption and assignment of the Lease dated December 8, 1988, and amended on September 14, 1989, by and between SM and Kmart Corporation (the "SM Lease") for store number 3693 (the "Premises"), as requested in the motion for order pursuant to 11 U.S.C. § 365 and Fed.R.Bank.P. 6006 authorizing Debtors to assume and assign certain unexpired Real Property Leases to Rubloff Development Group, Inc. ("Rubloff") is approved subject to the terms and conditions as more fully set forth herein."

(Rubloff R. 5).

Similarly, on March 25, 2002, the bankruptcy court entered an Order approving and authorizing KMART to assume:

> "those certain unexpired Leases of non-residential property as set forth on Schedule A along with any and all easements, licenses, non-disturbance agreements, or other similar agreements entered into by the Debtors which relate to the use or occupancy of the leased properties (the "Properties"), and all amendments, licenses, consents and other similar agreements between the Debtors  and the Landlords under the Leases (collectively, the "Landlords") relating  to the Properties (collectively, the "Real Property Leases")...

(Rubloff R. 5).

It is important to note that Schedule A to this Order identifies only the two Master Leases involved at Harwood Heights, Illinois and Jenison, Michigan. No Subleases are identified in said Schedule A. On March 25, 2002, the bankruptcy court entered a similar Order with the

70549966v3 810787

relevant language being identical as it relates to the Bollingbrook, Illinois property. (Rubloff R. 5). Again, the Schedule to the March 25, 2002 Order identified only the Bolingbrook, Illinois Master Lease and not any Sublease. Additional Orders entered on March 25, 2002 relating to the Homewood, Illinois property and the Walker, Michigan property contain identical language with the Schedule attached to the Orders including and identifying only the Master Leases. (Rubloff R. 5). In fact, all of the Orders entered by the bankruptcy court in connection with the final approval of the assumption and assignment of the eight (8) Master Leases involved herein, all contain similar provisions and identify on the Schedule indicating the lease(s) to be assigned as only the Master Lease(s). (Rubloff R. 5). There is no mention in any of the orders of the Subleases. As such, even if the bankruptcy court was correct in its conclusion that the Assignment and Assumption Agreement was ambiguous, given the fact that KMART drafted the Assignment and Assumption Agreement and given the parol evidence, the bankruptcy court should have reached the inescapable conclusion that the definitions of "Lease" and "Leases" in the Lease Assignment and Assumption Agreement refers only to the Master Leases.

The bankruptcy court also ignored the fact that when KMART wanted to exclude any claim for damages resulting from its breach of the Subleases, KMART knew how to accomplish that goal simply by inserting language in the agreement that required the waiver of any claim under a sublease. No such language is contained in the Assignment and Assumption Agreement. In construing an ambiguity, a court may also look to other extrinsic evidence as to prior and contemporaneous transactions and facts to ascertain the intent of the parties. *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714 (7th Cir. 2003). As the drafter of the Assignment and Assumption Agreement, if KMART wanted to exclude any damages arising from the Subleases, KMART certainly could have done so just as it had in other agreements with Rubloff. In

agreements related to Hobart, Indiana and Oak Lawn, Illinois (neither locations are a part of the Claims), KMART expressly provided that RUBLOFF would be barred from seeking any damages as a result of any breach of the respective subleases. (Rubloff R. 9, 10). The fact that KMART did not so expressly provide in the Assignment and Assumption Agreement should have led the bankruptcy court to the conclusion that the Subleases were not a part of the Assignment and Assumption Agreement.

E.    **The bankruptcy court erroneously concluded that RUBLOFF waived its claims when it took an assignment of the Master Leases without reserving said claims.**

The bankruptcy court lastly erroneously concluded that RUBLOFF waived its claims when it took an assignment of the Master Leases. In short, the bankruptcy court relied upon *Aerovias Nacionales DeColumbia, S.A. Avianca*, 323 B.R. 879, 889 (Bankr. S.D.N.Y. 2005). In *Aerovias*, aircraft lessors and the debtor-in-possession entered into an agreement providing for the modification of certain leases to lower the rental rates before the debtor-in-possession assumed the leases. *Id.* After the assumption of the modified leases was approved, the lessors filed a proof of claim asserting damages based upon the rent deferential. *Id.* However, the court in *Aerovias* denied the claim stating, in part, that had the lessor wanted to reserve such a right, it should have been explicitly provided for in the assumption document. *Id.*

The holding in *Aerovias* is not applicable to the case at bar due to several distinguishing factors. First and foremost, the court in *Aerovias* was applying New York law when it reached the conclusion that in order to retain the right to make a claim it must be explicitly provided for in the papers. *Id.* The court in *Aerovias* cited *Automotive Management Group, Ltd. v. SRB Management Co., Inc.*, 239 A.D.2d 450, 451, 658 NYS2d 54, 55 (2d Dept. 1997) in support of this holding which is not a bankruptcy case, but rather a New York State case applying New York State law. New York law is not applicable to the case at bar.

28

Further, the holding in *Aerovias* is also not applicable to the case at bar due to the substantial factual differences between *Aerovias* and the case at bar. In *Aerovias*, the debtor and lessor first agreed to modify the leases by reducing the rent due thereunder, and thereafter, the debtor agreed to assume those leases. *Id.* In other words, once the lessor and debtor agreed to amend the lease and reduce the amount of rent which the debtor would owe, the debtor agreed to assume that lease. *Id.*

In the case at bar, on the other hand, KMART did not agree to assume the Master Leases following an agreement to amend the Master Leases by reducing the amount of rent due thereunder. Rather, KMART simply elected to assign its rights under the Master Leases to RUBLOFF without any modification to the Master Leases whatsoever. There was no agreement or negotiation to modify the terms of Master Leases. The facts in the case at bar do not present a situation as existed in *Aerovias* wherein the parties to a lease voluntarily agreed to amend the lease to reduce the amount owed from the debtor thereunder and the landlord later filed a proof of claim. Rather, in the case at bar no amendment to the Master Leases was agreed upon; rather, the Master Leases were assigned in full force and effect from KMART to RUBLOFF. In addition, the holding in *Aerovias* is not applicable to the case at bar as RUBLOFF's Claims do not arise out of the Master Leases which were assumed as they did in *Aerovias;* rather, they arise out of KMART's anticipatory breach of the Subleases, which were separate and distinct leases. As such, the holding in *Aerovias* was inappropriately relied upon by the bankruptcy court and RUBLOFF should not have been held to have waived its entitlement to file the claims simply because it entered into the Assignment and Assumption Agreement.

KMART was represented by sophisticated and very well paid counsel during the period of time the in question. The bankruptcy court seems to be saying to Rubloff that if Rubloff

29

wanted to retain its rights to file proofs of claims for damages incurred as a result of KMART's anticipatory repudiation of its obligations under the Subleases, then Rubloff was under an affirmative duty to notify KMART of its intentions to exercise it contractual remedies. There is no such duty imposed on Rubloff under either Michigan or Illinois law. When a party repudiates a contract, the non-breaching party is not required to tender performance or comply with the conditions precedent. *Builders Concrete* at 105. Instead, if KMART wanted Rubloff to waive its claims under the Subleases, then it was KMART's obligation to make such a waiver part of the deal. KMART never did.

## VII.    CONCLUSION

The evidence at trial showed that in addition to filing the Rejection Motion, KMART took definitive steps that announced its clear intention that it would not perform under the Master Leases. Ultimately, the bankruptcy court approved the immediate rejection of those Master Leases as no further court action was necessary to reject the Master Leases after the bankruptcy court Order was entered authorizing the rejection of the leases. (Rubloff R.3). Based upon those facts, the bankruptcy court should have concluded that KMART anticipatorily repudiated the Subleases, thus permitting RUBLOFF to file the Claims. Further, the bankruptcy court also should have concluded that the Assignment and Assumption Agreement applied to the Master Leases alone and not the Subleases such that RUBLOFF did not agree to assume any liability of KMART under the Subleases or agree to hold KMART harmless for any liability under the Subleases. Accordingly, this Court should reverse the holding of the bankruptcy court, enter an Order that the Claims are allowed and that Debtor's objection thereto is overruled, and remanding this case to the bankruptcy court for proceedings regarding the amount of the Claims.

30

Dated:  January 24, 2008

Respectfully submitted,

RUBLOFF DEVELOPMENT GROUP, INC.,
an Illinois corporation, Appellant

BY:    HINSHAW & CULBERTSON LLP

BY:    /s/Thomas J. Lester
        Thomas J. Lester
        Attorney for Appellant
        HINSHAW & CULBERTSON LLP
        100 Park Avenue
        P.O. Box 1389
        Rockford, IL  61105-1389
        Telephone (815) 490-4900
        Facsimile (815) 490-4901
        tlester@hinshawlaw.com

31

## CERTIFICATE OF SERVICE

I, Thomas J. Lester, an attorney, hereby certify that on January 24, 2008, I electronically filed the **BRIEF OF APPELLANT, RUBLOFF DEVELOPMENT GROUP, INC.** with the Clerk of the U.S. District Court, using the CM/ECF system reflecting service thereof to be served on:

Andrew Goldman
WILMER CUTTER PICKERING LLP
399 Park Avenue
New York, N Y  10022

William J. Barrett
BARACK, FERRAZZANO, KIRSCHBAUM,
PERLMAN & NAGELBERG, LLP
333 W. Wacker Drive, Suite 2700
Chicago, IL  60606

and via UPS Next Day Air Mail to the above-referenced parties of record by delivering a copy thereof, enclosed in the proper UPS mailing envelope at 100 Park Avenue, Rockford, Illinois, at or before the hour of 5:00 p.m. on January 24, 2008, proper postage prepaid.

/s/Thomas J. Lester
Thomas J. Lester
Attorney for Appellant
HINSHAW & CULBERTSON LLP
100 Park Avenue
P.O. Box 1389
Rockford, IL  61105-1389
Telephone: 815-490-4900
Facsimile: 815-490-4901
tlester@hinshawlaw.com

70549966v3 810787