**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| KMART CORPORATION, *et al.*, | ) |
| | ) Bankr. Case No. 02-02474 |
| Debtors. | ) (Jointly Administered) |
| ——————————————————— | ) |
| | ) |
| RUBLOFF DEVELOPMENT GROUP, INC., | ) |
| | ) |
| Appellant, | ) Civil Action No. 1:08-CV-00076 |
| v. | ) |
| | ) Hon. John F. Grady |
| KMART CORPORATION, | ) |
| | ) |
| Appellee. | ) |
| | ) |
| ——————————————————— | ) |

**BRIEF OF KMART AS APPELLEE**

WILMER CUTLER PICKERING HALE
   AND DORR LLP
Andrew N. Goldman
Craig Goldblatt
Lisa Lynch
399 Park Avenue
New York, NY 10022
Telephone: (212) 230-8800

BARACK FERRAZZANO KIRSCHBAUM
   & NAGELBERG LLP
William J. Barrett (6206424)
200 West Madison, Suite 3900
Chicago, IL 60606
Telephone: (312) 629-5170
Fax: (312) 984-3150
william.barrett@bfkn.com

*Attorneys for Kmart Corporation*

Dated: February 8, 2008

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................................1

ISSUES PRESENTED....................................................................................................4

STATEMENT REGARDING ORAL ARGUMENT................................................5

STATEMENT OF THE FACTS AND THE CASE...............................................5

STANDARD OF REVIEW ...........................................................................................16

ARGUMENT ...................................................................................................................16

I.    THE SUBLEASE TERMS PRECLUDE RUBLOFF'S DAMAGES
      CLAIMS ..........................................................................................................16

II.   KMART DID NOT ANTICIPATORILY REPUDIATE THE
      SUBLEASES...................................................................................................18

      A.   The Doctrine Of Anticipatory Repudiation Requires Kmart To
           Have Definitively And Unequivocally Stated It Would Not
           Perform ....................................................................................................19

      B.   Kmart, As A Debtor in Possession, Was Disabled From Binding
           Itself Absent Bankruptcy Court Approval ..........................................20

      C.   Kmart's Statements That it Would Seek Approval To Reject The
           Leases If Rubloff Did Not Take Assignment Of Them Do Not
           Constitute Anticipatory Repudiation .................................................23

      D.   The Very Arguments Rubloff Presents Are Entangled In Logical
           Inconsistencies .......................................................................................26

III.  THE ASSIGNMENT AGREEMENT BARS RUBLOFF'S
      DAMAGES CLAIMS......................................................................................28

      A.   Rubloff Indemnified Kmart Against The Very Losses It Now
           Seeks To Recover ..................................................................................29

      B.   Kmart Assumed And Assigned All Obligations Under The
           Subleases To Rubloff..............................................................................31

      C.   For Rubloff To Have Retained Its Sublease Claims, It Was
           Required To Reserve Them Explicitly ................................................37

CONCLUSION................................................................................................38

## TABLE OF AUTHORITIES

### CASES

*Central States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*,
  252 F.3d 911 (7th Cir. 2001) ................................................................. 22-23

*Golant v. Care Comm, Inc.*,
  216 B.R. 248 (N.D. Ill. 1997) ................................................................. 16, 34

*Henderson v. Lemna*,
  394 N.E.2d 1070 (Ill. App. Ct. 1979) .................................................... 20, 24

*In re Aerovias Nacionales de Colombia S.A. Avianca*,
  323 B.R. 879 (Bankr. S.D.N.Y. 2005) ......................................................... 37

*In re Arden & Howe Assocs.*,
  152 B.R. 971 (Bankr. E.D. Cal. 1993) ........................................................... 1

*In re Handy Andy Home Improvement Ctrs., Inc.*,
  144 F.3d 1125 (7th Cir. 1998) ..................................................................... 23

*In re Thinking Machs. Corp.*,
  67 F.3d 1021 (1st Cir. 1995) ................................................................. 21, 22

*Jackson v. American Can Co.*,
  485 F. Supp. 370 (W.D. Mich. 1980) ..................................................... 19, 24

*Leibowitz v. Parkway Bank & Trust Co.*,
  210 B.R. 298 (N.D. Ill. 1997) ................................................................. 16, 34

*Mungo v. Taylor*,
  355 F.3d 969 (7th Cir. 2004) ................................................................. 16, 34

*Raleigh v. Illinois Dept. of Revenue*,
  530 U.S. 15 (2000) ...................................................................................... 20

*Stonecipher v. Pillatsch*,
  332 N.E. 2d 151 (Ill. App. Ct. 1975) ................................................. 19, 20, 24

### STATUTES

11 U.S.C. § 365 ................................................................................... *passim*

11 U.S.C. § 502(g) ......................................................................................... 1

## INTRODUCTION AND SUMMARY OF ARGUMENT

One of the tools the Bankruptcy Code affords a debtor seeking to reorganize is the right to "reject" leases and executory contracts.  If a debtor concludes that the economic terms of such contracts are unfavorable, and that complying with those terms would burden the reorganization effort, the debtor may escape those obligations by rejecting the contract.  11 U.S.C. § 365.  If the debtor determines to reject the contract, and the bankruptcy court grants the debtor's motion to reject, the contract is deemed breached immediately prior to the bankruptcy filing, with the counterparty receiving a claim in the bankruptcy case for any compensable damages it suffers from the breach.  *Id.* § 502(g).  That "rejection damages" claim is treated in bankruptcy like other unsecured claims held by the company's creditors.  *Id.*

In the face of the possibility that a lease may be rejected, counter-parties to contracts will often engage in negotiations with the debtor in which the parties renegotiate the terms that the debtor found burdensome, hoping to reach agreement on different terms—ones that the debtor would not seek to "reject" in its bankruptcy case.  Like any other financial negotiation, debtors will often invoke their right to seek rejection—if acceptable alternative terms cannot be agreed upon—as a tool to negotiate more favorable terms.  *See, e.g., In re Arden & Howe Assocs.*, 152 B.R. 971, 976 (Bankr. E.D. Cal. 1993) (debtor "can use the threat of rejection as leverage to negotiate a change" in lease terms).

That is exactly what happened here.  Several years before its bankruptcy, Kmart had entered into long-term leases with certain landlords (the "Master Landlords") for eight different commercial properties (such leases, the "Master Leases").  Kmart had closed its stores on each of those properties, but because it was obligated to continue to pay rent until the expiration of the Master Leases, it subleased the properties to Rubloff Development Group ("Rubloff"), a developer (the "Subleases"), which in turn sub-subleased the properties to its retail tenants.

The rent Rubloff paid Kmart under the eight Subleases was less than the amount Kmart owed the Master Landlords each month.  Upon filing for bankruptcy, Kmart filed a motion in the Bankruptcy Court, seeking approval to reject a number of leases, including six of the Master Leases and corresponding Subleases.  The filing of that motion triggered an intense set of negotiations with Rubloff.  In the end, Kmart and Rubloff reached an alternate agreement under which Kmart would not reject the leases.  Rather, they entered into an assumption and assignment agreement (the "Assignment Agreement") under which Kmart agreed to assign the leases to Rubloff, and Rubloff agreed to assume all of Kmart's obligations under the leases, including its obligations to the Master Landlords.  In light of that agreement, Kmart withdrew its request for an order authorizing the immediate rejection of the Master Leases and Subleases.

In this appeal, however, Rubloff contends that Kmart's various statements in the course of those negotiations, in which it indicated that it would seek to obtain a court order permitting it to reject the contracts if an acceptable agreement to assume and assign the leases could not be reached, amounted to an "anticipatory repudiation" of the Subleases, permitting Rubloff to recover damages from Kmart, even though the Subleases were never, in fact, rejected.

The Bankruptcy Court rejected that theory.  Following a trial at which the Court had the opportunity to hear witness testimony and assess credibility, it rejected Rubloff's arguments both on the law and on the facts.  It thus entered an order disallowing Rubloff's claims.  That decision was correct for three separate and independent reasons.

*First*, Rubloff's claims are barred by the terms of the Subleases themselves.  Article 27 of the Subleases expressly provides that in the event the Master Leases are assigned by Kmart to a third-party, Rubloff would be entitled to look only to the assignee for performance of the

obligations that Kmart undertook in the Subleases.  Because Rubloff itself took an assignment of the Master Leases, it was required to look only to *itself* for performance of the Subleases.

*Second*, Rubloff's efforts to avoid the implications of Article 27 of the Subleases, by relying on the doctrine of anticipatory repudiation, are entirely unsuccessful.  In the face of contractual language making plain that Rubloff must look only to itself for damages arising after the effective date of the Assignment Agreement, Rubloff is left to argue that prior to that time— exactly when, Rubloff never quite explains—Kmart anticipatorily repudiated the Subleases. That argument is entirely unsuccessful.  The law is clear that anticipatory repudiation requires a clear and unequivocal statement that a party will not fulfill its contractual obligations.  Kmart made no such statement—having represented only that it *would* seek approval to reject the contracts if an acceptable resolution were not achieved.  Having reached such an agreement, Kmart had no reason to obtain an order authorizing the rejection of the Subleases, and no such order was ever entered.  Indeed, because the rejection of an executory contract *requires* the approval of the bankruptcy court, Rubloff's theory—under which a debtor could anticipatorily repudiate an executory contract unilaterally and without obtaining court approval—would undermine the role of the bankruptcy court and the protections that role affords to creditors and other parties-in-interest.

*Finally*, Rubloff's arguments are barred by the terms of the very Assignment Agreement to which the parties agreed and that the Bankruptcy Court approved.  That agreement provides that Rubloff would assume the "Leases"—a term that the Bankruptcy Court found to be ambiguous, but that after hearing witness testimony found to include the Subleases.  Having agreed to an assignment of all of Kmart's Sublease obligations to it, Rubloff thereby extinguished any claims it might otherwise have had.  Moreover, in that same Assignment

Agreement, Rubloff also agreed broadly to indemnify Kmart from all losses it might incur "in connection with the Leases." The very losses that are the subject of Rubloff's proofs of claim undoubtedly arose "in connection with the Leases"—even if "Leases" were defined to mean only the Master Leases, as Rubloff contends. This is so because Rubloff's losses are for the "spread" between the higher rent obligations it assumed from Kmart *in connection with* the Master Leases and the lower rent due under the Subleases.

At the end of the day, Rubloff's argument boils down to a complaint that it is unhappy that Kmart's ability to assume or reject leases—a right the Bankruptcy Code gave Kmart as a debtor-in-possession—forced Rubloff to the negotiating table, leading it to reach an agreement whose terms it is now trying to escape. As a legal and factual matter, however, this case is not a difficult one. Rubloff's contentions that Kmart anticipatorily repudiated the Subleases—when the Bankruptcy Court never entered an order providing for their rejection, and when it is undisputed that Rubloff was never deprived of the right of possession of the properties that Kmart had agreed to provide it under the Subleases through the effective date of the Assignment Agreement—are without merit. The judgment of the Bankruptcy Court should be affirmed.

## ISSUES PRESENTED

This appeal presents the following issues:[1]

1.    Whether, upon assuming Kmart's obligations under the Master Leases, Rubloff was required by the terms of the Subleases to look only to itself, as the assignee of the Master Leases, for the very claims it now asserts.

2.    Whether Kmart anticipatorily repudiated its obligations to Rubloff under the Subleases.

3.    Whether, if Kmart anticipatorily repudiated the Subleases, Rubloff's claim is barred by the Assignment Agreement, which:

---

[1]    While Rubloff's statement of issues identifies ten issues on appeal, each of the issues Rubloff raises is subsumed within the three issues set forth above.

4

A.    Provides that Rubloff would indemnity Kmart from the very losses it now seeks to recover from Kmart,

B.    Provides that Rubloff would assume Kmart's obligations under the Subleases, thus extinguishing and releasing its right to the rejection damages claims it asserts here, and

C.    Does not contain any express preservation of Rubloff's right to present a rejection damages claim, as the caselaw requires if a party in Rubloff's position were to seek to preserve such a claim.

## STATEMENT REGARDING ORAL ARGUMENT

In view of the relative simplicity of the factual and legal issues raised in this appeal, Kmart does not believe that oral argument is necessary. If the Court were to conclude, however, that argument would be beneficial to the Court, Kmart would certainly present such argument and address any questions the Court may have regarding this appeal.

## STATEMENT OF THE FACTS AND THE CASE

In the 1990s, Kmart was a tenant under certain long-term leases of commercial property for "big box" retail stores (the "Master Leases"). ROA 13, Master Leases.[2] Because of the stores' poor economic performance, Kmart closed those stores prior to its bankruptcy, and vacated the premises. ROA 23, Trial Tr. 57:22-58:4. In an attempt to reduce its losses from the vacated properties, Kmart entered into sublease agreements. Trial Tr. 24:10-21.

Between October 1998 and July 2000, Kmart entered into thirteen sublease agreements with Rubloff. Trial Tr. 13:1-3, 67:6-9. Eight of those sublease agreements are involved in this dispute. ROA 1, Proofs of Claim. For each of those eight subleases, Kmart sublet the properties (the "Demised Premises") to Rubloff at a rent that was less than the rent Kmart was obligated to pay its landlords (the "Master Landlords").

---

[2]    Reference to Appellant's Designation of Items for Record on Appeal is cited in the form of "ROA ___."

**The Subleases**

The eight subleases entered into between Kmart and Rubloff relating to the Demised Premises (the "Subleases" [3]) each follow the same general form.  ROA 23, Trial Tr. 59:16-22, 103:23-104:2.  The material terms of the Subleases are the same; Kmart was to provide Rubloff with possession of the Demised Premises and Rubloff was required to pay a specified amount of rent to Kmart.  Trial Tr. 60:5-12.  In order lawfully to convey possession of the properties to Rubloff, Kmart's primary obligation was to ensure that the Master Leases remained in place. Trial Tr. 60:13-18.

Each of the Subleases expressly provides that in the event Kmart transfers its interests under the Master Leases to another party, Rubloff could look only to the transferee of Kmart's interest in the Master Leases for performance of Kmart's obligations under the Subleases.  ROA 1, Subleases at Art. 27.  Article 27 further provides that in the event of such a transfer, the Subleases would no longer be binding on Kmart.  *Id.*  As discussed below, the Master Leases were transferred to Rubloff itself.  ROA 23, Trial Tr. 103:4-8, 106:13-15.  Thus, upon Kmart's transfer to Rubloff of its interests in the Demised Premises, Rubloff could only look to itself for performance under the Subleases.  Trial Tr. 102:11-20, 102:25-103:2, 103:9-14, 118:7-13.

The Subleases do not contain any provision providing for the acceleration of damages to the subleasee in the event of default.  ROA 1, Subleases.

**The Pre-Petition Period**

During the time period leading up to Kmart's bankruptcy, Rubloff became aware, through the media and other sources, of concerns relating to Kmart's financial condition.  ROA

---

[3]    The eight (8) Subleases at issue relate to the following properties: Bolingbrook, IL, Harwood Heights, IL, Homewood, IL, Matteson, IL, Rockford, IL, Jenison, MI, Kentwood, MI, and Walker, MI.

23, Trial Tr. 21:4-16, 64:17-65:4.  In response to these concerns, Rubloff officials contacted

Kmart personnel to discuss Kmart's deteriorating financial condition.  In those conversations,

Kmart made no assurances to Rubloff about what would occur with the company or its leases in

the event of a Kmart bankruptcy.  Trial Tr. 65:9-13.  At the same time, no one from Kmart made

any unequivocal statement that Kmart would not perform its obligations under the Subleases.

Trial Tr. 65:18-66:10.

        In fact, up until—and after—Kmart's filing for bankruptcy, Kmart did perform its

obligations under the Subleases, which included providing Rubloff with possession of the

Demised Premises at the agreed rental rate.  Trial Tr. 60:19-61:2, 61:12-21, 66:11-20, 118:14-

119:11.  Kmart also satisfied its obligations under the Master Leases, making all required rent

payments it owed to the Master Landlords.  ROA 16, Joint Statement at 11, ¶ 17.  In sum, up

until Rubloff's assumption of Kmart's obligations under the Master Leases (explained further

below), Kmart fulfilled all of its obligations to Rubloff under the Subleases.  ROA 23, Trial Tr.

60:7-61:8, 61:12-21, 104:3-14.[4]

**Kmart's Bankruptcy and the Rejection Motion**

        Kmart filed its bankruptcy petition on January 22, 2002.  That same day, it filed a motion

with the Bankruptcy Court to reject some 300 leases, including the Subleases and Master Leases

for the Demised Premises, with the exception of the leases for the Bolingbrook, Illinois and

Kentwood, Michigan premises (as to which Kmart had not yet completed its economic analysis).

ROA 16, Joint Statement at 8, ¶ 3.

---

[4]    In fact, at the time of the Assignment Agreement, Kmart contends that the only party that had
defaulted was Rubloff, as it had failed to pay rent owed to Kmart under the Subleases.  The parties have
agreed that all disputes regarding amounts Kmart contends are owed to it by Rubloff—if the parties are
unable to resolve such matters consensually—would be deferred to a later proceeding, following this
Court's determination regarding Rubloff's claims against Kmart.  ROA 16, Joint Statement at 11, ¶ 20;
ROA 23, Trial Tr. 4:3-6:2.

In Kmart's motion to reject the leases (the "Rejection Motion"), Kmart sought an order from the Bankruptcy Court that provided for different treatment for different types of leases. ROA 2, Rejection Motion.  Specifically, Kmart listed leases that it believed to be of no economic value to the estate on "Schedule A" of the Rejection Motion.  *Id.*; ROA 22, Findings of Fact and Conclusions of Law ("Bankr. Op.") at 2.  Kmart sought a court order providing for immediate rejection of those leases.  *Id*.  Kmart listed leases that it believed it might seek to reject, but as to which it had not reached a firm conclusion to pursue rejection, on "Schedule B."  ROA 2, Rejection Motion.  With respect to the leases listed on Schedule B, Kmart sought the establishment of expedited procedures:  rather than being required to file a separate motion to reject such leases, Kmart sought the authority to reject them upon giving the counterparty (as well as its creditors' committee, or, until a committee was formed, its 20 largest creditors) 10 days' notice.  *Id.*; ROA 3, Rejection Order; ROA 22, Bankr. Op. at 3.

Six of the properties that Kmart subleased to Rubloff were included on Schedule A of the Rejection Motion, which listed both the Master Leases and the Subleases relating to each of those six properties.[5]  ROA 2, Rejection Motion.

Kmart supported the Rejection Motion with an affidavit by Charles C. Conaway, who was Kmart's Chairman and CEO.  ROA 14, Conaway Affidavit.  The Conaway affidavit explained Kmart's business judgment for moving to reject the leases.  ROA 23, Trial Tr. 79:22-80:23.

**Kmart's and Rubloff's Negotiations**

Negotiations between counsel began almost immediately upon Rubloff's receipt of the Rejection Motion.  Trial Tr. 27:5-14, 28:6-10, 30:20-31:4, 68:16-21.  Kmart took a firm and

---

[5]    The six properties were: Harwood Heights, IL, Homewood, IL, Matteson, IL, Rockford, IL, Jenison, MI, and Walker, MI.

clear position in these negotiations that unless the parties reached an agreement that it found satisfactory, it would pursue its Rejection Motion.  Trial Tr. 68:22-69:5.  Specifically, Kmart made clear that it would be willing to forego rejection of the leases only if Rubloff agreed to accept an assignment of the Master Leases, to cover any "cure costs" associated with the assumption and assignment of the Master Leases,[6] and to indemnify Kmart for any liability it might incur "in connection with" the Master Leases.  Trial Tr. 30:20-31:4, 31:9-13, 31:18-32:2, 72:9-19, 95:14-16, 105:6-12, 106:16-25, 137:6-20.  Kmart expressed its position both in discussions between counsel and in communications that took place between officers of the two companies.  Trial Tr. 22:24-23:9, 23:19-24:1; 30:20-31:4, 68:10-69:5, 72:9-16, 82:2-12.

Although Kmart was clear that it wanted to find a way out from under its Master Lease obligations, Kmart did not say that it planned to cease performance under those agreements or the Subleases.  *See* Trial Tr. 68:22-69:5 (it was clear that Kmart intended to get out of its ongoing obligation under the Master Leases, but the form of how it would get out of those ongoing negotiations was an "open question").

At no time during its discussions with Rubloff did Kmart suggest in any way that it would fail to honor its obligations as a debtor-in-possession, which required it to obtain court approval in order to reject any contract.  In no case did Kmart make any suggestion that it would take unilateral action without complying with the orders of the bankruptcy court, providing its creditors and parties-in-interest notice of its proposed actions, and allowing affected parties an opportunity to be heard.  *See* Trial Tr. 69:6-10 (Mark Robinson, the President of Rubloff, understood that Kmart could not reject the leases unless and until the Bankruptcy Court entered an order approving the rejection); *see also* Trial Tr. 28:16-22, 80:15-22, 121:22-122:7.

---

[6]     A party in bankruptcy that "assumes" an unexpired lease or an executory contract is required to "cure" any past defaults with respect to the lease or contract, *see* 11 U.S.C. § 365(b)(1)(A).

On January 24, 2002—just prior to the time the Rejection Motion was scheduled to be heard by the Bankruptcy Court—counsel reached an agreement in principle as to the leases for the six properties that Kmart had initially sought to reject.   The parties agreed that Kmart's obligations under those leases would be assumed and assigned to Rubloff.  Trial Tr. 31:18-32:2. At some time between January 23 and January 25, 2002, the parties agreed to add the Kentwood and Bolingbrook leases to the assumption and assignment agreement.  *See* Trial Tr. 32:7-10.

**The Rejection Order**

By January 25, 2002, as a result of its negotiations with Rubloff, Kmart had moved the Master Leases and Subleases for the six properties from Schedule A to Schedule B of the Rejection Motion it had filed with the Bankruptcy Court.  Trial Tr. 31:18-32:2, 77:22-78:1.  On January 25, 2002, the Bankruptcy Court entered the order approving the Rejection Motion ("Rejection Order"), with the Master Leases and Subleases set forth on Schedule B (the "Rejection Order").  ROA 3, Rejection Order.  Once the Rejection Order was entered, if Kmart decided to seek rejection of any of the Master Leases or Subleases, it was required to comply with the ten-day notice provisions set out in the order.  ROA 23, Trial Tr. 69:13-71:10; 82:2-12; ROA 3, Rejection Order.   Kmart never sent a ten-day notice of rejection pursuant to those procedures (the "Rejection Notice") for any of the Master Leases or Subleases.  ROA 23, Trial Tr. 70:14-71:17.[7]

---

[7]      Despite Kmart never having sent a Rejection Notice for any of the Master Leases, Rubloff states that the Master Leases were in fact rejected with the approval of the Bankruptcy Court.   "On January 25, 2002, the [B]ankruptcy [C]ourt had approved the rejection by Kmart of the Master Leases."  Rubloff Br. 10.  Rubloff's statement is simply incorrect.  As pointed out by the Bankruptcy Court, the statement "ignores that the process provided that the rejection was *not effective* until the notice was given and [that] Kmart reserved the right to *not* send the notice."  ROA 22, Bankr. Op. 14 (emphasis added).  Because "Rubloff did not object to, or appeal from, the order approving the [ten day notice] process…. Rubloff cannot argue now that rejection was effective *prior* to delivery of the notice."  *Id.* (emphasis added).

**The Assignment Agreement**

Per the agreement in principle they had reached, the parties ultimately negotiated and documented an assumption and assignment agreement (the "Assignment Agreement").  The Assignment Agreement provided, *inter alia*, that (a) Kmart would assume and assign to Rubloff all of its right, title and interest under the Master Leases listed on Schedule 1 thereto (¶¶ 1, 2), "together with any and all other leases or agreements affecting the Premises" (collectively defined therein as the "Leases") (First Whereas Clause); (b) Rubloff would assume all financial responsibility for the costs to Kmart of any amounts owing under the Leases through the Assignment Date (including payment of any cure claims (¶¶ 3, 9)); and (c) subsequent to the Assignment Date, Rubloff would indemnify Kmart for all claims arising in connection with the Leases (¶ 5).  *See* ROA 12, Assignment Agreement.

The term "Leases" was an operative term in the Assignment Agreement, as Rubloff agreed to assume all of Kmart's obligations under the "Leases."  In an e-mail exchange between Thomas Lester, counsel for Rubloff, and Marian Wexler, counsel for Kmart—in the course of the parties' negotiation of the terms of the Assignment Agreement—Ms. Wexler listed the leases that Kmart agreed to move from Schedule A of the Rejection Motion (immediate rejection upon entry of the court's order) to Schedule B (authority for Kmart to reject upon ten days' notice). ROA 11, Email Exchange at 3.[8]  Specifically, Kmart moved *both* the Master Leases and Subleases to Schedule B.  ROA 3, Rejection Order, Schedule B.  In the parties' email exchange, Ms. Wexler indicated that "these leases"—the ones moved from Schedule A to Schedule B— would be the subject of the Assignment Agreement.  "We will file a motion to assume and assign these leases to your client."  ROA 11, Email Exchange at 3.

---

[8]    *See also* Kmart's Counter-Designation of Items for Record on Appeal, Item 7, Email Exchange at 3.

Another key aspect of the Assignment Agreement is the indemnification clause found at paragraph 5. ROA 12, Assignment Agreement. Rubloff agreed to:

> indemnify, protect, defend and hold harmless [Kmart] from and against all claims, damages, losses, costs and expenses (including attorneys' fees) arising in connection with the Leases and relating to the period subsequent to the Assignment Date.

*Id*. at ¶ 5. This indemnification provision is very broad and holds Rubloff liable for all claims arising "in connection with" the Leases. Specifically, the clause is not limited to losses and claims "under" the Leases, but extends more broadly to losses and claims "in connection with" the Leases. *See* ROA 23, Trial Tr. 137:6-20 (Mark Robinson, President of Rubloff, who was involved in the drafting of the Assignment Agreement, never insisted that the phrase "arising in connection with the leases" should be narrowed to "arising under the leases").

**The Assignment Motion**

Because the agreement to assume and assign the Leases to Rubloff, like any determination to assume or reject an executory contract or unexpired lease, required the approval of the Bankruptcy Court, Kmart filed a motion on February 4, 2002 seeking approval of the Assignment Agreement (the "Assignment Motion"). In that motion, Kmart stated that the Assignment Agreement was in the best interests of its creditors and its bankruptcy estate because, had it rejected the leases, its estate would be exposed to significant rejection damages claims. It further stated that such rejection damages claims could "be avoided entirely" by assumption and assignment of the leases to Rubloff. ROA 4, Assignment Motion at ¶ 16. Kmart further explained that the estate could "avoid almost all costs associated with the disposition of the Leases if the Assignment Agreement is approved." *Id.*

Rubloff reviewed a copy of the Assignment Motion prior to the Bankruptcy Court's approval of the motion. ROA 23, Trial Tr. 109:20-22, 110:2-7. Mark Robinson, President of

Rubloff, admitted at trial that he would have called to the Court's attention any representation therein that he believed was inconsistent with his understanding of the deal reached between the parties. Trial Tr. 110:8-11, 114:15-19. Rubloff gave no indication that it disagreed with Kmart's statements in the Assignment Motion. On February 13, 2002, the Bankruptcy Court held a hearing to consider approval of the Assignment Motion. Again, Rubloff remained silent, never disclosing that it took the position that even if the Assignment Agreement were approved, it would nevertheless assert the $28 million rejection damages claim that is the subject of this appeal.

### Approval of the Assignment Agreement

In a series of rulings made over the next five months, following the consensual resolution of issues that had arisen with respect to the Master Landlords on certain of the properties, the parties sought and received Court approval of the Assignment Agreement with respect to each of the individual Demised Premises. The Court entered seven orders approving the agreement in connection with the eight properties that are the subject of the Claims ("Assignment Orders"). ROA 5, Assignment Orders. The Court entered the last Assignment Order on July 18, 2002.

### Rubloff's Claims

Only days after the Bankruptcy Court entered the last of the Assignment Orders, on July 29, 2002, Rubloff filed the proofs of claim seeking damages in the amount of $28,660,212.21.[9] ROA 16, Joint Statement at 11, ¶ 16. Rubloff calculated its damages by determining the "spread" between the lower rent rate under the Subleases and the larger amount Rubloff agreed to pay under the terms of the Master Leases. ROA 23, Trial Tr. 48:3-6, 99:1-4. Rubloff

---

[9]     The Proofs of Claims are numbered 37506, 37507, 37508, 37509, 37733, 37734, 37735 and 37773 (collectively, the "Claims").

calculated its damages from the Assignment Date (February 1, 2002), through the end of the

remaining term under each Sublease.  Trial Tr. 99:1-4, 104:20-24.

**Summary Judgment Ruling**

The parties filed cross motions for summary judgment with respect to the Claims on

February 27 (Kmart) and April 4, 2006 (Rubloff).   The Bankruptcy Court considered the

motions at a hearing held on May 18, 2006.  On December 6, 2006, the Bankruptcy Court denied

both parties' motions for summary judgment.  The Bankruptcy Court held that certain issues of

fact remained to be resolved, including whether Kmart may have breached the Subleases during

the period leading up to the assignment date by failing to pay any rent owed under the Master

Leases (ROA 8, Ruling Tr. 18:17-19:14, 24:9-13)[10] and whether the parties intended the term

"Leases" in the Assignment Agreement to include the Subleases, or to refer only to the Master

Leases (*id*. 21:24-22:8).  The Bankruptcy Court's summary judgment ruling, however, squarely

rejected Rubloff's two primary arguments, holding that: (a) Kmart's filing of the Rejection

Motion could not itself constitute an anticipatory repudiation of the Subleases, and (b) by

application of Article 27 of the Subleases, Rubloff could only look to Kmart's transferee (here,

Rubloff itself) for any claims or obligations that arose after Kmart's assignment of the leasehold

interests to Rubloff.  Id. at 18:5-11, 24:1-6).

**Trial**

This matter was tried before the Bankruptcy Court on May 14, 2007.  Rubloff put

forward Mark Robinson, the company's president, who testified regarding his understanding of

the operative documents as well as the dealings between the two companies.  Kmart cross-

examined Mr. Robinson, but did not otherwise present testimony.  On November 20, 2007, the

---

[10]     Following the summary judgment ruling but prior to trial, Rubloff stipulated that Kmart had made
the required rent payments.  *Supra* 7.

Bankruptcy Court issued a seventeen-page decision and entered an order disallowing each of the eight Claims filed by Rubloff.

**The Bankruptcy Court's Decision**

Because the parties stipulated to certain of the material facts and exhibits (ROA 16, Joint Statement at 8-12, 13-14), the Bankruptcy Court's opinion largely set forth the facts as stipulated by the parties.  ROA 22, Bankr. Op. at 1-6.  The Bankruptcy Court ruled first that Rubloff's evidence of anticipatory repudiation—Kmart's filing of the Rejection Motion and Kmart's statements thereafter (*id*. at 13)—was insufficient.  *Id*. at 13.  The Court reasoned that Kmart, as a debtor in possession, could not have effectively rejected the Subleases, regardless of any statements it may have made, without first obtaining the bankruptcy court approval required by statute.  *Id*. at 13 ("No matter how unequivocal a debtor in possession's statements are prior to the rejection becoming effective [by court approval], those statements are effectively rendered equivocal because of the operation of section 365 of the Bankruptcy Code.").  The Court further noted that the only order it had issued provided that rejection of the Subleases would *not* be effective until the ten day notice was given and further provided that Kmart had the discretion *not* to issue any such notice.  *Id*. at 14.  And because a rejection notice was in fact never delivered to Rubloff, "Rubloff cannot argue now that rejection was effective."  *Id*.  Accordingly, the Bankruptcy Court disallowed Rubloff's Claims.

The Bankruptcy Court also ruled in the alternative that *even if* Rubloff had proven that Kmart had anticipatorily repudiated the Subleases, any resulting claims for damages "were effectively released . . . by virtue of certain terms of the Assignment Agreement and Subleases." *Id*.  The Court found as a matter of fact, based on its evaluation of the trial testimony and exhibits, including an email exchange between the parties, that the parties intended the

Assignment Agreement to encompass both the Master Leases and the Subleases. *Id*. at 15. As a result, "the term "Leases" used in the Assignment Agreement included the Subleases." *Id*. "So, if Rubloff were entitled to the 'spread' damages claim, it agreed to assume that liability pursuant to the Assignment Agreement." *Id*. The Court further held that both the plain language of the indemnification provision in the Assignment Agreement and Article 27 of the Subleases independently barred Rubloff's damages claims. *Id*. at 15-16. Finally, the Bankruptcy Court concluded that Rubloff had waived its claims when it "took an assignment of the assumed Master Leases" without reserving any right to assert the spread damages resulting from any "purported repudiation of the Subleases in connection with the assumption and assignment process." *Id*. at 16, 17.

## STANDARD OF REVIEW

The trial court's findings of fact are reviewed for clear error, while its conclusions of law are reviewed *de novo*. *Mungo v. Taylor*, 355 F.3d 969, 974 (7th Cir. 2004); *Golant v. Care Comm., Inc*., 216 B.R. 248, 252 (N.D. Ill. 1997); *Leibowitz v. Parkway Bank & Trust Co*., 210 B.R. 298, 301 (N.D. Ill. 1997). While much of the Bankruptcy Court's opinion addresses issues of law, the Court did make a critical factual finding—that the parties' intent, in using the term "Leases" in the Assignment Agreement, was to include (and thus to assign to Rubloff) Kmart's rights and obligations under *both* the Master Leases and the Subleases. ROA 22, Bankr. Op. 15. This factual finding can only be disturbed if this Court were to conclude that it is clearly erroneous.

## ARGUMENT

## I.    THE SUBLEASE TERMS PRECLUDE RUBLOFF'S DAMAGES CLAIMS

Under the Subleases, Kmart was required to provide Rubloff with possession of the Demised Premises. It is undisputed that Kmart did so by fulfilling its obligations under the

Master Leases up until the time of their assignment to Rubloff, thereby meeting its obligations under the Subleases to provide Rubloff with lawful possession of the Demised Premises. ROA 23, Trial Tr. 60:19-61:2, 61:12-21, 66:11-20, 118:13-119:11. Once Rubloff entered into the Assignment Agreement and assumed Kmart's Master Lease obligations, Kmart's obligations under the Subleases were effectively extinguished. This simple point bears emphasis. In this appeal, Rubloff is seeking damages for breach of a contract—the Subleases—whose terms Kmart fully honored and satisfied for the entire period that the contract was in place between the parties.

Rubloff nevertheless claims that it was damaged because it was required to pay the higher rent required by the Master Leases for the period after it had agreed to assume those Master Leases. In essence, Rubloff's argument is that its *agreement* to assume the Master Leases caused its injury—the measure of damages being the difference (or the "spread") between the lower rent provided in the Subleases and the greater amount provided for in the Master Leases it assumed. Rubloff Br. at 23-24.[11]

This theory, however, is directly contrary to the express terms of the Subleases. Specifically, Article 27 of the Subleases makes clear that Kmart was free to transfer its interests in the subleased properties, and that if it did so, it would have no continuing obligations to Rubloff under the Subleases:

> Binding Effect. . . . The covenants and obligations of Sublessor [Kmart] under this Sublease shall not be binding upon the Sublessor [Kmart] herein named or any subsequent sublessor with respect to any period subsequent to the transfer of all its interests in the Demised Premises, and, in the event of any such transfer, Sublessee [Rubloff] agrees to look solely to the transferee for the performance of any term, covenant, obligation, warranty or representation of Sublessor [Kmart] hereunder, but only with

---

[11]    The Brief of Appellant Rubloff Development Group, Inc., filed on January 24, 2008, is hereinafter referred to as "Rubloff Br."

respect to the period beginning with such transfer and ending with a
subsequent transfer of such interest.

ROA 1, Subleases at Art. 27.   Thus, as found by the Bankruptcy Court, "the Subleases provide

that if and after Kmart transferred its interests in the Master Leases, Rubloff could look only to

Kmart's assignee [in this matter, Rubloff] for the performance of, *inter alia*, 'any term, covenant,

[or] obligation' of Kmart under the Subleases."  ROA 22, Bankr. Op. at 15.

Article 27 is fatal to Rubloff's claims to the "rent spread" for the remainder of the terms

of the Leases.  See ROA 1, Proofs of Claim.  The Master Leases were transferred to Rubloff

effective February 1, 2002.  From that date forward, by the express terms of the Subleases,

Kmart had no further obligations under the Subleases and Rubloff could look only to the

transferee (here, Rubloff itself) for performance under the Subleases.  Inasmuch as Rubloff's

claim to the rent "spread" applies exclusively to rent it paid after the assignment date, from

February 1, 2002 forward, its claims are plainly precluded by operation of Article 27.  ROA 22,

Bankr. Op. at 14.

## II.    KMART DID NOT ANTICIPATORILY REPUDIATE THE SUBLEASES

Seeking to avoid Article 27's effective preclusion of its damages claims for the period

*after* Kmart's transferred its interest in the Master Leases, Rubloff argues that its damages

accrued *prior to* that date because Kmart had somehow "anticipatorily repudiated" the Subleases

in the period between January 22 and January 25, 2002.  Rubloff Br. 23.  On that basis, Rubloff

contends, the provision of Article 27 (which applies to performance *after* the effectiveness of the

assignment of the Master Leases on February 1, 2002) would not apply.  *Id*.

The difficulty with this argument is that—as the Bankruptcy Court correctly concluded—

anticipatory repudiation does not apply to the circumstances here.  The doctrine of anticipatory

repudiation requires Kmart to have made a definitive and unequivocal statement that it would not

perform.  The various statements Kmart made (*see* Rubloff Br. 11-12), it made as a debtor in

possession with circumscribed powers.  In light of that legal status, its statements were

necessarily conditional and equivocal.  The Bankruptcy Court correctly reasoned that "no matter

how unequivocal a debtor in possession's statements are" prior to a bankruptcy court's approval

of a contract or lease's rejection, "those statements are effectively rendered equivocal" because

of the bankruptcy court's role in the decision process to reject, as set forth in Section 365 of the

Bankruptcy Code.  ROA 22, Bankr. Op. at 13.  This basic principle of bankruptcy law entirely

dooms Rubloff's anticipatory repudiation claims.

### A.    The Doctrine Of Anticipatory Repudiation Requires Kmart To Have Definitively And Unequivocally Stated It Would Not Perform

As the Bankruptcy Court correctly noted, Rubloff's anticipatory repudiation theory

requires it to show that Kmart made "an unequivocal, definitive statement" that it would not

perform its obligations under the Subleases.  ROA 22, Bankr. Op. at 7 (citations omitted).[12]  The

point of the doctrine is to permit the other party immediately to sue to recover damages arising

out of a future breach, rather than requiring it to wait until performance would otherwise be due.

This self-help remedy arises only upon a contract party's unambiguous and unequivocal

declaration of its intent not to perform.  *See Jackson v. American Can Co.*, 485 F. Supp. 370, 373

(W.D. Mich. 1980; *Stonecipher v. Pillatsch*, 332 N.E. 2d 151, 153 (Ill. App. Ct. 1975) (citations

omitted).  In contrast, "doubtful and indefinite statements that the performance may or may not

take place or mere requests to change the terms of a contract are not, in and of themselves,

---

[12]    *Compare* Rubloff Br. at 17 ("the evidence need only show that the repudiating party manifested an intent that it will not render performance under the contract"); *see also id.* at 8-9.  This statement of the doctrine omits that a repudiating party must manifest a *definitive and unequivocal* intent not to render performance.

enough to constitute repudiation." *Stonecipher*, 332 N.E. 2d at 153 (citations omitted); *see also Henderson v. Lemna*, 394 N.E.2d 1070, 1072 (Ill. App. Ct. 1979).

The evidence at trial showed that Kmart's statements to Rubloff were both equivocal and conditional and accordingly did not constitute anticipatory repudiation.  At trial, there was no suggestion that prior to its bankruptcy filing, Kmart made any unequivocal statements regarding its intent to reject the Subleases.  ROA 23, Trial Tr. 65:18-66:10.  The only evidence that Kmart intended not to perform its obligations under the Subleases were certain statements by Kmart made *after* it filed for bankruptcy relief on January 22, 2002.  And on appeal to this Court, Rubloff points to these same post-petition statements.  *See* Rubloff Br. 11-12.  Rubloff's reliance on this post-petition evidence is misplaced.  Upon filing for bankruptcy, Kmart as a debtor in possession could not make any definitive statements regarding its intent not to perform, as it was obligated to first seek and obtain bankruptcy court approval before making any decision to breach a contract obligation. [13]

### B.   Kmart, As A Debtor In Possession, Was Disabled From Binding Itself Absent Bankruptcy Court Approval

The Bankruptcy Court correctly found that Kmart, upon filing for chapter 11 protection, could at most express to Rubloff its intention *to seek permission* to reject the unexpired leases between the parties—a statement that by its nature is conditional, rather than definitive.  *See* Bankr. Op. at 12.   This is so because Section 365 of the Bankruptcy Code requires a debtor in possession, such as Kmart, to obtain prior approval from the bankruptcy court to reject its

---

[13]     While Kmart's statements would not have amounted to an anticipatory repudiation under any formulation of the legal standard, the Bankruptcy Court correctly noted that the fact that Kmart was a debtor in possession at the time it made the statements, with authority thus circumscribed by the Bankruptcy Code, must be borne in mind in determining whether any statement otherwise satisfied the applicable state-law standard for anticipatory repudiation of a contract.  ROA 22, Bankr. Op. at 7 & 9 (citing *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20 (2000)).

obligations under any unexpired lease.  11 U.S.C. § 365(a).  The Bankruptcy Code thereby gives

creditors and other parties in interest an opportunity to be heard on the proposed business

decisions being made by the bankrupt debtor, in which they have an ultimate interest.  While the

debtor's own business judgment is entitled to a measure of deference in the analysis, its

judgment nonetheless is scrutinized and examined in light of the other parties' objections and the

interests of the estate.  As the Bankruptcy Court explained, the factors weighing in the court's

analysis include (i) the possible profitability of that lease in a reorganization scenario, (ii)

whether it might be possible and beneficial to the estate to assume the lease in order to assign it

to a third-party purchaser in exchange for consideration, and (iii) the possible claims against the

estate if it instead rejected the unexpired lease.  *Id*. at 11-12.  The bankruptcy court's oversight

role with respect to these determinations, reflected in the Bankruptcy Code, is a critical part of

the congressional design.  *In re Thinking Machs. Corp*., 67 F.3d 1021, 1026 (1st Cir. 1995)

(Congress included the requirement of bankruptcy court approval in Section 365(a) in order to

involve bankruptcy courts in the decisional process of whether to assume or reject a contract).

Kmart filed its initial Rejection Motion on January 22, 2002, seeking the Bankruptcy

Court's approval to reject more than 300 leases.  ROA 22, Bankr. Op. 2.  If the mere filing of

that Rejection Motion constituted an anticipatory repudiation of those 300 unexpired leases, then

Kmart's estate would have been immediately exposed to enormous rejection damages without

the Bankruptcy Court ever having an opportunity even to consider the merits of rejecting those

leases.  Such a result would eviscerate the bankruptcy court's role under Section 365(a) to

oversee the debtor's decisions and to protect the estate's interests.  *Thinking Machs*., 67 F.3d at

1026 (to allow rejection without court approval would trivialize judicial oversight of the

rejection process); *see also* ROA 22, Bankr. Op. at 13 ("to conclude that the mere filing of the

21

Rejection Motion, and/or other statements of Kmart amounted to an anticipatory repudiation of the Subleases would render section 365 meaningless"). Indeed, it is precisely because "judicial approval will always be the last step in the rejection pavane," that a debtor's "repudiation of a lease can never be valid in any meaningful sense until the court has acted." *In re Thinking Machs. Corp.*, 67 F.3d at 1027. Moreover, it is self-evident that a request by a debtor to the bankruptcy court for *permission* to breach an unexpired lease falls far short of the type of "unequivocal and definitive" statement required to show repudiation.

Despite Rubloff's various contrary arguments (*see* Rubloff Br. 16), this result is fully in accord with Seventh Circuit case law. It has already been recognized in this Circuit that the mere filing of a bankruptcy cannot constitute anticipatory repudiation. *Central States, Se. and Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911, 917 (7th Cir. 2001). The reasoning of *Central States* applies equally to the filing of a motion to reject. Bankr. Op. at 11. As the Seventh Circuit pointed out, a debtor in possession can rescind a contract or affirm it. *Central States,* 252 F.3d at 916. Because "[a]ffirmance is the opposite of repudiation," the debtor's "affirmance option" "makes it impossible" to consider the contract repudiated upon the debtor's mere filing for bankruptcy. *Id.* Similarly, here, until Kmart decided to reject the unexpired leases, and until that rejection became legally effective pursuant to a bankruptcy court order, there was always the possibility that Kmart would instead "end up 'exercising the affirmance option.'" Bankr. Op. at 12. That "open assumption option" (*id.*) means that the debtor's statements regarding its intent to reject cannot be definitive. *Id.*[14]

---

[14]    Rubloff cites *Central States* for the proposition that anticipatory breach applies in bankruptcy when it is "reasonably certain that the other party is not going to meet its obligations." Rubloff Br. at 16 (citing *Central States*, 252 F.3d at 919). This statement is taken so far from its context that its meaning is distorted. The principal issue in *Central States* was when the statute of limitations began to run on a pension plan's lawsuit for damages resulting from a debtor/ employer's withdrawal from the pension

Rubloff's response is to contend that if this analysis is correct, it renders "the doctrine of anticipatory repudiation meaningless" as to debtors in possession. Rubloff Br. at 15. But by its own terms, the anticipatory repudiation doctrine does not apply in contexts in which a party's statements are equivocal or conditional. Accordingly it should not apply to debtors in possession that merely state an intent *to seek permission to reject* by virtue of filing a motion to reject, and that, in fact, chose *not to reject*. ROA 22, Bankr. Op. at 13. Moreover, in a bankruptcy context, the court approval process itself provides the contract party notice and the opportunity to participate and be heard prior to the rejection becoming effective. And until the proposed rejection is approved by the court, the debtor in possession is obligated to perform the post-petition obligations set forth in the unexpired lease. 11 U.S.C. § 365(d)(3); *see also In re Handy Andy Home Improvement Ctrs., Inc*., 144 F.3d 1125, 1127 (7th Cir. 1998). For that reason, the conclusion that a debtor-in-possession is effectively disabled from unilaterally anticipatorily repudiating an executory contract should be neither controversial nor surprising.

### C.    Kmart's Statements That It *Would* Seek Approval To Reject The Leases *If Rubloff Did Not Take Assignment Of Them* Do Not Constitute Anticipatory Repudiation

Rubloff contends that various statements Kmart made between its filing of its initial Rejection Motion, on January 22, 2002, and the Bankruptcy Court's issuance of its order, on

---

plan. The statute of limitations could have began to run either when the debtor failed to make a payment when it came due, or when the debtor repudiated the obligation to pay prior to the due date. As a matter of law, under the Multiemployer Pension Plan Amendments Act, if the debtor/employer ceased operations at any time, that would effect its complete withdrawal from the pension plan. *Central States*, 252 F.3d at 914 (citing 29 U.S.C. § 1383(a)(2)). Applying Section 1383(a)(2), the *Central States* court concluded that as of the date the debtor/employer ceased operations, the debtor/employer repudiated its obligations under the plan and the statute of limitations thus began to run. *Id*. at 919. As the court explained, as of the date on which business operations were ceased, the pension plan could be "reasonably certain" that the debtor was "not going to meet its obligations." *Id*. Nothing in *Central States*, however, remotely suggests a mere statement that a debtor intended to exercise its authority to seek permission to reject an executory contract might itself amount to an anticipatory repudiation.

January 25, 2002, amounted to an anticipatory repudiation.  Rubloff Br. 11-12.  During that time,

Kmart and Rubloff engaged in negotiations in which Kmart said that, if no satisfactory

agreement on an assignment were reached, it would seek the Bankruptcy Court's approval to

reject the leases.  ROA 23, Trial Tr. 72:2-19, 74:1-4.  Rubloff's evidence boils down to this: (i)

Kmart stated that the Master Leases and Subleases were not profitable to it and (ii) Kmart stated

that it *would* seek bankruptcy court approval to reject those unprofitable leases *if* Rubloff did not

take assignment of them.  Rubloff Br. 11-12; *see also* ROA 23, Trial Tr. 82:2-9, 82:10-12.  Such

statements by Kmart do not amount to anticipatory repudiation.

The reason for this should be obvious.  Anticipatory repudiation requires an unequivocal

and definitive statement by a party that it will not perform its obligations under a contract.  *See*

*Jackson*, 485 F. Supp. at 373; *Stonecipher*, 332 N.E. 2d at 153.  Statements that are indefinite

and conditional do not satisfy that standard.  *Stonecipher*, 332 N.E. 2d at 153; *Henderson*, 394

N.E.2d at 1072.  And the statements to which Rubloff points are, by their very nature,

conditional.  Kmart's expression of its intention to seek rejection—an intention *conditioned* on

the inability of the parties to reach a satisfactory agreement—cannot amount to anticipatory

repudiation.

Rubloff's only response to this point is its contention that the Bankruptcy Court's order

approving the Rejection Motion on January 25, 2002 marked the date the anticipatory

repudiation became effective.  Rubloff Br. at 18.  That argument, however, is entirely

misleading, because by the time the Bankruptcy Court issued its order approving the Rejection

Motion, the Master Leases and Subleases had been moved from Schedule A to Schedule B.[15]

---

[15]    The leases moved to Schedule B did not include the leases for two properties, Bolingbrook and
Kentwood.   Kmart never sought the Bankruptcy Court's approval to reject the leases for either of those
properties.  *See* Bankr. Op. at 3.

The consequence of having the leases listed on Schedule B was that Kmart obtained court approval to employ expedited procedures *if it ultimately determined, in the future, to reject* any of the leases on that Schedule.  ROA 22, Bankr Op. at 3.  Far from being any sort of "unequivocal" statement of an intent to reject, the very procedure outlined in the order was *equivocal*, providing flexibility only if a decision to reject was ultimately made.  Moreover, under the procedures set forth in the order, *if* Kmart chose to reject a lease on Schedule B, it was required to provide the counterparty to the unexpired lease and the creditors committee ten days notice and an opportunity to object.[16]  *See id*.  Here, of course, it is undisputed that once the Bankruptcy Court entered the order listing the Rubloff leases on Schedule B, Kmart never sent Rubloff the 10-day notice providing for their rejection.  The reason for that is obvious enough— rather than rejecting these leases, Kmart ultimately assumed and assigned them to Rubloff. Rubloff's various arguments that Kmart had already breached the leases[17] (thereby entitling Rubloff to accelerate damages for the remaining term of the leases) are in a word—nonsense—as the parties instead ultimately agreed that Kmart would assume and assign those very same leases to Rubloff.

---

[16]    *Compare* Rubloff Br. at 17 ("The January 25, 2002, order was a final order and nothing within the order provided any creditor with the right to object to Kmart's rejection of any lease on Schedule B.") But by requiring Kmart to provide a Rejection Notice ten days before any rejection would be legally effective, the order expressly sets forth a time period in which the counterparty to the lease or other creditors may come forward and object to Kmart's proposed rejection.  Rubloff's various other conclusory statements that Kmart, by January 25, 2002, had anticipatorily repudiated the Subleases, are both unsupported and unsupportable.  *See, e.g.*, Rubloff Br. at 18 ( "Kmart breached the Subleases"); *id.* at 23 ("Article 27 of the Subleases does not provide a safe haven for Kmart's prior breach of the Subleases.").

[17]    Rubloff repeats its mantra throughout its brief that "Kmart breached the Subleases," as if mere repetition might make it true. Rubloff Br. at 18; *id.* at 9-10, 19, 23, 29.  Rubloff's averments that Kmart breached the Subleases rest on hypotheticals of what *might have* happened. According to Rubloff, after the Bankruptcy Court's January 25, 2002 Order, Kmart *could have* sent a Rejection Notice, and  it is a "foregone conclusion" (Rubloff Br. at 17) that the Bankruptcy Court *would have* affirmed Kmart's business judgment over any objections that *could have* been raised during the ten day notice period.  But all this ignores that Rubloff is not entitled to damages for what *might have*—but did not—happen.

Rubloff's response to this flaw in its anticipatory repudiation claim is a plea for sympathy. Rubloff concedes that Kmart's statements of its intent to seek rejection were conditional on not reaching a satisfactory assignment agreement. *See e.g.*, Rubloff Br. at 16 ("*If Rubloff had not agreed to the [Assignment Agreement], Kmart …would have* sent the ten-day notice and rejected.") (emphasis added). But Rubloff is not entitled to damages for what Kmart *might* have done—but did not in fact do. Plainly, Kmart never did make the unequivocal and definitive statement that it was rejecting the leases. Instead, the parties reached an Assignment Agreement. Under that agreement, Rubloff assumed the obligation to pay the higher rents due to the Master Landlords. Rubloff may now be unhappy with the deal that it struck, and with the bargaining leverage that the Bankruptcy Code provides a debtor in possession. But the doctrine of anticipatory repudiation does not allow it to avoid its contractual bargain.

### D.    The Very Arguments Rubloff Presents Are Entangled In Logical Inconsistencies

It is also worth noting that the anticipatory repudiation arguments Rubloff advanced at trial, and that it advances again on this appeal, are tangled in internal inconsistencies that it is entirely unable to address. Rubloff's failure to address these glaring deficiencies in its argument further demonstrates the correctness of the Bankruptcy Court's decision.

#### 1.    *Rubloff fails to explain how Kmart anticipatorily repudiated the Subleases but not the Master Leases*

Rubloff asserts that Kmart anticipatorily repudiated the Subleases by (a) filing the Rejection Motion that sought approval to reject both the Master Leases and Subleases[18] (ROA 2, Schedule A), (b) filing the Conaway affidavit in support of the Rejection Motion which similarly

---

[18]    The terms "Master Leases" and "Subleases" are intended here to refer to those leases for the six (6) properties that Kmart sought bankruptcy court approval to reject, and are *not* intended to refer to the leases for either the Bolingbrook or Kentwood properties.

stated that the Master Leases and Subleases had no economic value to Kmart (Rubloff Br. at 11(iii)), (c) asserting in negotiation discussions that Kmart would reject the Master Leases and the Subleases unless Rubloff agreed to an assignment (*id*. at 11(i & x)), and (d) statements by Kmart employees that the Master Leases and Subleases were going to be rejected (*id*. at 11(iv-vii)). Rubloff cannot explain, however, how Kmart's statements and actions described above resulted in anticipatory repudiation of the Subleases, while at the same time leaving the Master Leases valid and in effect, such that they could be assumed and assigned to Rubloff. ROA 23, Trial Tr. 92:25-92:12.

Rubloff's dilemma is inescapable. Rubloff itself has admitted that "Kmart's rejection of the Master Leases would have had a domino effect on the Subleases, the Sub-Subleases and the Subleasehold Mortgages. If Kmart rejected the Master Leases, Rubloff's interest in the Demised Premises would cease." Rubloff Br. 5. In other words, Rubloff's rights to those properties hinge on Kmart's not having rejected the Master Leases. In order for Rubloff to have a legitimate right to lease and/or occupy the Demised Premises, Kmart must have kept the Master Leases in effect through the date of assignment so that Kmart's rights thereunder could be assumed and assigned to Rubloff. Rubloff is therefore left in the uncomfortable position of averring that Kmart's statements—which applied equally to the Master Leases and the Subleases—constituted a repudiation of only the Subleases. To date, Rubloff's response to this conundrum has been to ignore it.

> 2. *Rubloff fails to address how Kmart anticipatorily repudiated certain Subleases that Kmart never even sought bankruptcy court approval to reject*

Kmart never moved to reject the Master Leases or Subleases related to the Kentwood and Bolingbrook properties. ROA 22, Bankr. Op. 3 ("At the time, Kmart required additional time to

investigate the value of the Bolingbrook and Kentwood stores before determining whether to include them in the Rejection Motion.") (citing ROA 16, Joint Statement Pt. II at ¶ 7); *see also* Rubloff Br. at 4 (acknowledging that leases for only six of the eight properties were listed on the Rejection Motion Schedules). The Bolingbrook and Kentwood properties instead were raised during negotiations between Rubloff and Kmart on the form of an assignment agreement. ROA 23, Trial Tr. 32:7-12. Allegedly, Kmart made statements then that it might, absent a satisfactory agreement, move to reject the Bolingbrook and Kentwood leases—although the trial record contained no specifics as to who said what to whom.

Rubloff nonetheless asserts its anticipatory repudiation claim with respect to the Bolingbrook and Kentwood properties. The claims as to Bolingbrook and Kentwood stretch the reasoning of Rubloff's anticipatory repudiation theory—which was quite thin enough already— far beyond the breaking-point. According to Rubloff, any statement made by a debtor indicating that it might reject an unexpired lease serves to anticipatorily repudiate that lease and give rise to an immediate claim for rejection damages. Although Rubloff is apparently untroubled by this result—which would turn the entire statutory mechanism provided by Section 365 of the Bankruptcy Code into utter hash—Congress assuredly did *not* envision a bankruptcy process which left no meaningful role for either the bankruptcy court or parties in interest to examine and shape the debtor in possession's decisions over the disposition of estate property.

## III. THE ASSIGNMENT AGREEMENT BARS RUBLOFF'S DAMAGES CLAIMS

A deal was reached between Kmart and Rubloff pursuant to which Rubloff assumed all of Kmart's obligations under the leases and agreed to hold Kmart harmless from any claims in connections with the leases. That Assumption and Assignment Agreement leaves Rubloff without any claim against Kmart, even if Kmart had anticipatorily repudiated the Subleases

(which, as explained above, it did not).  ROA 22, Bankr. Op. at 14 ("even if Rubloff were entitled to [its anticipatory repudiation] claims, they were effectively released by Rubloff by virtue of certain terms of the Assignment Agreement").

Rubloff presents a series of jumbled arguments in its attempt to evade both the actual obligations it assumed (which the Bankruptcy Court correctly found included the Sublease obligations) and the breadth of the indemnity clause to which it agreed.  As explained further below, Rubloff attempts to distract the Court's attention from certain language in the indemnification clause by mixing-up the interpretation of that provision with separate issues related to the scope of the Assignment Agreement itself.  *See* Rubloff Br. at 20.  But regardless of the scope of the Assignment Agreement, Rubloff agreed to a broadly worded indemnification clause in that agreement which expressly bars it from seeking the very losses asserted in its proofs of claim.  The indemnity clause alone provided a sufficient basis for the Bankruptcy Court to disallow Rubloff's claims.  An additional independent basis, also found by the Bankruptcy Court, was that the parties intended in their Assignment Agreement for Rubloff to assume the obligations under both the Master Leases and the Subleases.  Having assumed the Sublease obligations, Rubloff relinquished any right to rejection damages.  ROA 22, Bankr. Op. at 14.

A.    **Rubloff Indemnified Kmart Against The Very Losses It Now Seeks to Recover**

In the Assignment Agreement, Rubloff agreed to a broad indemnification clause.  *See* ROA 12, Assignment Agreement ¶ 5; *see also* ROA 23, Trial Tr. 137:6-20.  Rubloff's brief attempts to bury the operative language from the indemnity by using a run-on sentence that obscures its meaning.  Rubloff Br. at 20.  This tactic is unsurprising as the actual contractual language thoroughly undermines its position.

The relevant indemnity language is set forth in paragraph five of the Assignment Agreement:

> Indemnification:  Assignee [Rubloff] hereby agrees to indemnify, protect, defend and hold Assignor [Kmart] harmless from and against all claims, damages, losses, costs and expenses (including attorneys' fees) arising *in connection with the Leases* and relating to the period subsequent to the Assignment Date.

ROA 12, ¶ 5 (emphasis added).  Even if the term "Leases" in this indemnity clause referred only to the "Master Leases"—as Rubloff contends (Rubloff Br. 20)[19]—Rubloff's claims unquestionably arise "in connection with" the Master Leases and relate to the period subsequent to the assignment date.  Rubloff's alleged damages are the rent "spread" between the Master Leases and the Subleases for the period beginning on the date of the assignment and ending on the last day of the Sublease term.  Rubloff Br. at 1 & 3; *see also* ROA 1, Rubloff's Proofs of Claim; ROA 22, Bankr. Op. at 6.  Such rent "spread" damages necessarily arise in *connection with* the Master Leases.  These claims thus fall within the broad language of the indemnity Rubloff provided to Kmart.

Rubloff tried and (unsurprisingly) failed at trial to persuade the Bankruptcy Court otherwise.  Rubloff argued first that the indemnification clause applied only to claims brought "under" the Leases, which Rubloff contended referred solely to claims "under" the Master Leases.  ROA 23, Trial Tr. 158:18.  But as the Court noted, this ignores the actual words of the indemnity, which are broader than that—applying to all claims or losses arising *in connection* with the Leases.  *Id*. 158:23-25.  Rubloff then tried arguing that the indemnity provision should be limited to third-party claims arising in connection with the Master Leases.  *Id*. at 161:23-

---

[19]    The Bankruptcy Court correctly found that the term "Leases" refers to both the Master Leases and the Subleases based on the definition of "Leases" set forth in the preamble to the Assignment Agreement.  Part III(B), *infra*.

162:1.  Here, too, the difficulty with Rubloff's argument is that it finds no support in the actual

language of the contract.

Unsurprisingly, the Bankruptcy Court's opinion concluded that, "Rubloff agreed in the

Assignment Agreement to hold Kmart harmless from all damages and claims 'arising in

connection with the Leases,' which encompasses the spread damages claim."  ROA 22, Bankr.

Op. at 15.   As a result, Rubloff's claims were properly disallowed on this basis alone.

B.      **Kmart Assumed And Assigned All Obligations Under The Subleases To Rubloff**

Rubloff's claims are also independently barred by the Assignment Agreement itself,

which provided for Rubloff to take an assignment not only of the Master Leases, but of all other

agreements relating to the Premises as well.  Once Kmart assigned all such agreements,

including the Subleases, to Rubloff, Kmart's obligation to perform thereunder was extinguished.

Bankr. Op. at 15 (concluding that "the Assignment Agreement includes the Subleases.  So, if

Rubloff were entitled to the "spread damages" claim, it agreed to assume the liability pursuant to

the Assignment Agreement.").

On appeal, Rubloff argues that the Bankruptcy Court misinterpreted "Leases," the

operative term in the Assignment Agreement.  Rubloff Br. 20-24.  Rubloff agreed only to assume

Kmart's liability under the "Leases"—which Rubloff contends unambiguously meant only the

Master Leases.  *Id*.  Rubloff further argues that even if the term "Leases" was ambiguous, the

Bankruptcy Court erred in resolving that ambiguity by finding that the parties intended "Leases"

to include the Subleases.  *Id*. 24-28.  Neither of Rubloff's arguments has merit.

       1.     *The term "Leases" unambiguously refers to the*
                *Master Leases and the Subleases*

Kmart argued at trial and contends on appeal that the term "Leases" in the Assignment Agreement is unambiguous and refers to *both* the Master Leases and the Subleases. The operative term "Lease" is defined in the agreement as follows:

> WHEREAS, Assignor [Kmart] entered into certain leases more particularly described in Schedule 1 attached hereto and made a part hereof [the Master Leases] (as the same may have been amended, supplemented or extended from time to time, *and together with any and all other leases or agreements affecting the Premises* (hereinafter defined), (individually, a "***Lease***" and collectively, the "***Leases***"), whereby Assignor [Kmart] leased from the landlord [the Master Landlord] set forth in Schedule 1 certain real property more particularly described in Schedule 1 and in the Leases (collectively, the "Premises").

ROA 12, Assignment Agreement (emphasis added). This definition of "Leases" is indisputably broader than only the Master Leases listed on Schedule 1, as the definition expressly encompasses those Master Leases on Schedule 1 "together with any and all other leases or agreements affecting the Premises." *Id.* Unquestionably, the Subleases are "leases or agreements affecting the Premises" and hence fall within the definition of "Leases."

The Bankruptcy Court agreed that the words "together with any and all other leases or agreements affecting the Premises*"* "could be read to include the Subleases." ROA 22, Bankr. Op. at 15. However, the Bankruptcy Court further reasoned that the phrase immediately thereafter, which defines the "Premises," introduced ambiguity into the definition of "Leases" as it "could be read to exclude the Subleases." *Id.* In any event, after considering the drafting history and other evidence, the Bankruptcy Court concluded as a matter of fact that the term "Leases" was intended by the parties to include the Subleases. *See* Part III(B)(2), *infra*.

Rubloff asks this Court to reverse the Bankruptcy Court's finding that the term "Leases" was ambiguous, and instead to find that the term unambiguously refers *only to the Master*

*Leases*.  This is an uphill argument for Rubloff to make given that the express terms of the

definition of "Leases" refer to the Master Leases "together with any and all *other* leases or

agreements affecting the Premises."[20]  ROA 12, Assignment Agreement (emphasis added).  In

response, Rubloff merely makes the facile statement that the definition of "Leases" refers

unambiguously and only to the Master Leases, "for it is only the Master Leases that are listed on

Schedule 1 to the [Assignment Agreement]."  Rubloff Br. at 21.  Rubloff's decision to ignore the

language in the definition of "Leases" which is inconvenient to its argument, simply underscores

the weakness of its position.

       Hoping that distracting this Court's attention might salvage its claims, Rubloff supports

its theory that "Leases" refers only to the "Master Leases" by analyzing certain selected

subsidiary provisions of the Assignment Agreement.  Rubloff Br. 22-23.  Importantly, Rubloff

does not argue—nor can Rubloff argue—that the term "Leases" is used consistently and

unambiguously *throughout* the subsidiary provisions to refer only to the Master Leases.

Accordingly, this Court should not countenance Rubloff's attempt to gloss over the very

definition of the term "Leases" by focusing instead on selected phrases from certain subsidiary

provisions.  Nor is Rubloff's argument that one of the subsidiary provisions employs the defined

term "Subleases" enlightening as to the meaning of the term "Leases."  *Id*. at 22 & 23.

Separately denoting and defining "Subleases" in subsection 9 merely provides greater clarity for

the purposes of that subsidiary provision.  *See* ROA 12, Assignment Agreement ¶ 9.  In the end,

Rubloff's diversionary tactics are merely that—diversions that lead nowhere.

---

[20]     At trial, Rubloff argued that those words "any and all other leases or agreements affecting the
Premises" referenced various operating and leasing agreements necessary to run a shopping center and to
sublease the properties to Rubloff's ultimate tenants—except, of course, the Subleases.  ROA 23, Trial Tr.
29:17-46:12.  The problem with Rubloff's theory was that the Assignment Agreement contained no
language carving out the Subleases from the broadly defined terms—"any and all other leases or
agreements affecting the Premises."  Rubloff has wisely abandoned this argument on appeal.

In sum, the most natural construction of the Assignment Agreement is that the term "Leases" refers unambiguously to the Master Leases and all other agreements relating to the Premises as well, including the Subleases. As such, Rubloff assumption of the "Leases," which includes the Subleases, bars its effort to recover damages from Kmart for its alleged "anticipatory repudiation" of those Subleases.

2.    *The parties intended the term "Leases" to refer to the Master Leases and the Subleases*

The Bankruptcy Court rejected Kmart's contention that the term "Leases" was unambiguous and included the Subleases, and therefore went on to review the evidence of the parties' intent in entering into the Assignment Agreement. Having heard the trial testimony and reviewed the contemporaneous documentation, the Bankruptcy Court concluded that the parties intended their agreement to encompass the Subleases. ROA 22, Bankr. Op. at 15. And if the Bankruptcy Court was correct that the definition of the term "Leases" is ambiguous, then even Rubloff concedes that the Bankruptcy Court's resolution of that ambiguity was a question of fact. Rubloff Br. at 25. The Bankruptcy Court's finding as to the parties' intent to include the Subleases is therefore subject to clearly erroneous review by this Court. *Mungo*, 355 F.3d at 974; *Golant*, 216 B.R. at 252; *Leibowitz*, 210 B.R. at 301. And there can be no serious suggestion that this factual finding was clear error.

The Bankruptcy Court relied in part upon an e-mail exchange between the parties in discerning their intent. ROA 22, Bankr. Op. at 15. In that e-mail exchange between Thomas Lester, counsel for Rubloff, and Marian Wexler, counsel for Kmart, Ms. Wexler agreed that Kmart would move the leases listed on Schedule A of its initial Rejection Motion to Schedule B of the final form of the Rejection Motion. ROA 11, Email Exchange. The leases which Kmart agreed to move included both the Master Leases and the Subleases related to the properties at

issue.  ROA 3, Rejection Order, Schedule B.  And in referring to those same leases that were moved from Schedule A to Schedule B—Ms. Wexler informed Mr. Lester that "[w]e will file a motion to assume and assign *these leases* to your client."  ROA 11, Email Exchange at 3 (emphasis added).  Mr. Lester assented.  *See id*. at 2.  Accordingly, the Bankruptcy Court concluded that the parties agreed to the broad parameters of an assignment agreement in which Rubloff would assume all of Kmart's obligations under both the Master Leases and the Subleases.  ROA 22, Bankr. Op. at 15.

Rubloff's brief falls far short of showing that the Bankruptcy Court clearly erred in that finding.  Indeed, Rubloff does not even attempt to counter the Bankruptcy Court's interpretation of the e-mail exchange.  *See* Rubloff Br. at 24-28.  Instead, Rubloff points to selected portions of certain documents in an analysis that ultimately sheds no light on the parties' intent.  *Id*.

Indeed, the very first document to which Rubloff directs this Court's attention only serves to muddle Rubloff's theory that the parties intended the term "Leases" to refer only to the Master Leases.  In that document, the motion for approval of the Assignment Agreement, the parties used the defined term "Real Property Leases" when referring to the Master Leases but also used the undefined term "*Leases*." At best, the parties' use of the term "Leases" is ambiguous in the passage to which Rubloff directs the Court's attention (*id*. at 25), but it is very plausible that the parties used "Leases" therein to refer both to the Master Leases and all other leases affecting the premises, including the Subleases.[21]

---

[21]     The relevant passage states first that "the rental obligations under the Real Property Leases (the Master Leases) are at or above market."  ROA 4, Assignment Motion at 6.  It continues, "Thus, the Debtors do not believe there is any value in the ***Leases***."  In other words, the rent obligations of Kmart under the Master Leases are above market, and Kmart cannot obtain adequate rent from subtenants to cover those above market rents, so there is no value to Kmart in retaining "the Leases"—either the Master Leases or the Subleases.

Rubloff next selectively quotes from a series of Bankruptcy Court orders that deal with third-party Master Landlord issues arising from Rubloff's assumption of Kmart's obligations to those Master Landlords.   *See id*. at 26-27 (citing ROA 5, the Assignment Orders).  Rubloff contends that because "[t]here is no mention in any of the orders of the Subleases" (*id*. at 27), Kmart and Rubloff must have intended for their Assignment Agreement to not include the Subleases.   But there is no import to the fact that the Assignment Orders refer only to the assumption and assignment of the Master Leases.  Those Assignment Orders were necessary to address third-party issues with respect to the Master Landlords.  There is no need for such orders to refer to the Subleases as there were no third-party issues implicated by the Subleases—once Rubloff assumed Kmart's obligations under the Master Leases, Rubloff was effectively both landlord and tenant under the Subleases.

Rubloff last points to the Bankruptcy Court orders with respect to the Hobart and Oak Lawn properties.  *Id*. at 27-28.  Neither of those two properties is the subject of Rubloff's proofs of claim.  Rather, Kmart rejected the Master Leases and Subleases with respect to those two properties.  *See* ROA 9 and 10, the Hobart and Oakland Orders.  While it is true that a provision in those agreements expressly bars Rubloff "from seeking any damages as a result of any breach of the respective subleases," that language was necessitated under those particular circumstances. Because Kmart rejected the Hobart and Oakland Subleases pursuant to a court order, Kmart's estate would have been exposed to rejection damages unless Rubloff expressly waived any rejection damages claims with respect to the Subleases, which it did.  There was no need for such an express waiver of damages as to the Leases subject to the Assignment Agreement, as that agreement provided for the assumption and assignment of those Leases to Rubloff—not their rejection.

In sum, Rubloff offers no basis to reverse as clearly erroneous the Bankruptcy Court's finding that the parties intended, as evidenced in their email exchange, that Rubloff assume the obligations of both the Master Leases and the Subleases. That intent simply confirms what the Assignment Agreement itself says—that the agreement would encompass not only the Master Leases but also the other leases affecting the Premises, including the Subleases.

### C.    For Rubloff To Have Retained Its Sublease Claims, It Was Required To Reserve Them Explicitly

The Bankruptcy Court made a third finding that bars Rubloff's claims, holding that Rubloff waived the claims it asserts here when it failed to explicitly reserve them in the Assignment Agreement. ROA 22, Bankr. Op. 16. That holding comports with the case law, which makes clear that when a party, in a situation such as Rubloff's, intends to retain the right to pursue a claim, notwithstanding an agreement with the debtor that would otherwise affect such a claim, it is obligated to negotiate for and obtain an explicit reservation of rights or the claim is waived. *See In re Aerovias Nacionales de Colombia S.A. Avianca*, 323 B.R. 879, 889 (Bankr. S.D.N.Y. 2005).

Rubloff's attempts to distinguish *Aerovias* are unconvincing. Rubloff Br. at 18-29. In *Aerovias*, the counterparty agreed to the debtor's assumption of certain leases as modified by the parties' agreement, only to spring a claim against the debtor for the damages that it suffered from the lower rents of the modified leases after the fact.[22] Just as the bankruptcy court found in *Aerovias* that for the counterparty "to have retained such a right, and it if it had been the

---

[22]    Not only did Rubloff fail to explicitly reserve its damages claims, but it remained silent when Kmart made representations in its motion to approve the Assignment Agreement that the parties had agreed to an assumption of the unexpired leases that would allow Kmart to avoid "entirely" the significant rejection damages claims to which it would otherwise be exposed. ROA 4, Assignment Motion ¶¶ 14, 16. Rubloff received and reviewed the motion but gave no indication that it held a contrary view and that it secretly believed its rejection damages claim would survive notwithstanding the Assignment Agreement. *See* ROA 23, Trial Tr. 110:1-10; 113:11-114:18.

intention of the parties that this right be reserved, it would have to be explicitly provided for in the papers," 323 B.R. at 889, the Bankruptcy Court here correctly found that Rubloff's failure expressly to reserve its right to "rejection damages" in the parties' assumption agreement operates as a waiver.

*    *    *

In the end, Rubloff's argument fails for each of the three reasons described above. *First*, the terms of the Subleases expressly release Kmart from any obligations under the Subleases upon the transfer of its obligations under the Master Leases and require Rubloff, as transferee, to look to itself, not Kmart, for performance thereunder. *Second*, Rubloff's effort to evade the terms of the Subleases by contending that Kmart anticipatorily repudiated the Subleases prior to the effective date of the Assignment Agreement are entirely unsuccessful. As a debtor in possession, Kmart was unable unilaterally to make such a definitive and unequivocal statement. And in any event the statements Kmart actually made were all conditional—they do not come close to meeting the standard for anticipatory repudiation. And *finally*, the terms of the Assignment Agreement, under which Rubloff itself assumed the leases in question and indemnified Kmart for any loss suffered in connection therewith, bar its claim. The Bankruptcy Court correctly ruled for Kmart on each of these three bases. Accordingly, Rubloff's effort to dismantle the Bankruptcy Court's judgment requires it to upend each of these three pillars of its ruling. But Rubloff's brief fails to dislodge any of them.

**<u>CONCLUSION</u>**

For the foregoing reasons, the judgment of the Bankruptcy Court should be affirmed.

Dated:  February 8, 2008

Respectfully submitted,

/s/ William J. Barrett
Andrew N. Goldman
Craig Goldblatt
Lisa Lynch
WILMER  CUTLER  PICKERING  HALE
    AND DORR LLP
399 Park Avenue
New York, NY  10022
Telephone: (212) 230-8800

- and -

William J. Barrett (6206424)
BARACK FERRAZZANO KIRSCHBAUM
    & NAGELBERG LLP
200 West Madison, Suite 3900
Chicago, IL  60606
Telephone: (312) 629-5170
Fax: (312) 984-3150
william.barrett@bfkn.com

*Attorneys for Kmart Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I, William J. Barrett, an attorney in the law firm of Barack Ferrazzano Kirschbaum & Nagelberg LLP, certify that I have this 8th day of February, 2008, caused to be served to the party below via e-mail transmission and overnight courier delivery, a copy of the foregoing Brief of Kmart as Appellee.

Thomas J. Lester
Hinshaw & Culbertson LLP
100 Park Avenue
Rockford, IL 61101
*E-mail: tlester@hinshawlaw.com*

/s/ William J. Barrett

472050v1