IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re:                                    Case No.: 1:08-CV-76

KMART CORPORATION, et al.,                Honorable Judge John F. Grady

        Debtors.

---

RUBLOFF DEVELOPMENT GROUP, INC.,    )    Appeal from the United States
                                    )    Bankruptcy Court for the Northern
        Appellant,        )    District of Illinois, Hon. Susan Pierson
                                    )    Sonderby, Case No. 02-02474 (jointly
v.                                  )    administered)
                                    )
KMART CORPORATION,                  )
                                    )
        Appellee.          )    **ORAL ARGUMENT REQUESTED**

## <u>REPLY BRIEF OF APPELLANT,<br>RUBLOFF DEVELOPMENT GROUP, INC.</u>

Thomas J. Lester
Matthew M. Hevrin
HINSHAW & CULBERTSON LLP
100 Park Avenue
P.O. Box 1389
Rockford, IL 61105-1389
Phone: (815) 490-4900
Facsimile (815) 490-4901

*Attorneys for Appellant,*
*Rubloff Development Group, Inc.*

Dated: March 3, 2008

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................ 1

II. ARGUMENT ...................................................................................................... 2

    A.  The standard of review to be applied in this case is *de novo*. .................. 2

    B.  KMART anticipatorily repudiated its obligations under the Subleases.................. 3

    C.  Contrary to KMART's assertions, the bankruptcy court never found that the actions of KMART did not amount to anticipatory repudiation; rather, the bankruptcy court found that it did not need to address that issue pursuant to Section 365 of the Bankruptcy Code.  However, even that conclusion was erroneous. ................... 5

    D.  KMART's argument that it could not have repudiated the Subleases because it did not ultimately reject the Master Leases and Subleases is erroneous.................. 6

    E.  Through its statements and actions, KMART repudiated both the Master Leases and Subleases. ........... 9

    F.  KMART also repudiated its obligations under the Bolingbrook and Kentwood Master Leases and Subleases. ............ 10

    G.  The Sublease terms do not bar RUBLOFF's claims.................. 11

    H.  The Assignment Agreement does not bar RUBLOFF's claims.................. 12

    I.  RUBLOFF was not required to explicitly reserve its claims in the Assignment Agreement.................. 20

III. CONCLUSION.................................................................................................. 21

70552228v2 810787

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Air Safety, Inc. v. Teachers Realty Corp.,*
    185 Ill.2d 457, 706 N.E.2d 882 (1999) .......................................................................2, 13, 14

*Ashe v. Sunshine Broadcasting Corp.,*
    90 Ill.App.3d 97, 412 N.E.2d 1142 (5th Dist. 1980) ...........................................6

*Central States SE and SW Pension Fund v. Basic American Industries, Inc.,*
    252 F.3d 911 (7th Cir. 2001) ...........................................................................12

*Golant v. Care Comm., Inc.,*
    216 B.R. 248 (N.D.Ill. 1997) ...........................................................................2

*Harmon Ins. Agency v. Thorson,*
    226 Ill.App.3d 1050, 590 N.E.2d 920 (3d Dist. 1992) ...............................6

*In re Aerovias Nacionales DeColumbia, S.A. Avianca,*
    323 B.R. 879 (Bankr. S.D.N.Y. 2005) ....................................................20, 21

*In re: Beech Systems Corp.,*
    164 B.R. 12 (Bankr. N.D.N.Y 1994) ................................................................9

*Kenisoft Development Corp. v. Softbank Holdings, Inc.,*
    139 F.Supp.2d 869 (N.D.Ill. 2001) ................................................................11

*King v. Taylor Chrysler-Plymouth, Inc.,*
    184 Mich.App. 204, 457 N.W.2d 42 (Mich.App. 1990)...............................6

*Leibowitz v. Parkway Bank & Trust Co.,*
    210 B.R. 298 (N.D.Ill. 1997) ...........................................................................2

*Mungo v. Taylor,*
    355 F.3d 969 (7th Cir. 2004) ...........................................................................2

*Paul v. Bogle,*
    193 Mich.App. 479; 484 N.W.2d 728 (Mich.App. 1992) ...........................11

*Stanton v. Dachille,*
    186 Mich.App. 247; 463 N.W.2d 479 (Mich.App. 1990) ...........................12

*Stonecipher v. Pillatsch,*
    30 Ill.App.3d 140, 332 N.E.2d 151 (2d. Dist, 1975) ...........................3, 11

i

*Thomas v. Pearl Vision,*
  251 F.3d 1132 (7th Cir. 2001) .................................................................................18

*Wilkie v. Auto Owners Insurance Co.,*
  469 Mich. 41 (2003) ........................................................................................18

*Wonderland Shopping Center Venture LP v. CDC Mort. Capital, Inc.,*
  274 F.3d 1085 (6th Cir. 2001) .........................................................................2, 13, 14

## STATUTES

Section 365 of the Bankruptcy Code .....................................................................5, 6, 9

70552228v2 810787

## I.   **INTRODUCTION**

In its Response Brief, KMART relies upon case law that has no bearing on the case at bar, ignores the well-recognized doctrine of anticipatory repudiation and disregards the majority of the language of the Assignment and Assumption Agreement ("Assignment Agreement") in favor of one particular "whereas" clause on which it bases its entire argument.  Ultimately, the fundamental flaws in KMART's Response Brief demonstrate the erroneous nature of the conclusions of both KMART and the bankruptcy court and demonstrate why RUBLOFF DEVELOPMENT GROUP, INC.'s ("RUBLOFF"), claims should be allowed in their entirety.

KMART argues that the bankruptcy court should be affirmed for three reasons.  KMART argues that terms of the Subleases require RUBLOFF to look only to itself once RUBLOFF assumed the Master Leases.  KMART also argues that as a debtor in possession it is impossible for it to anticipatory repudiate the Subleases.  Finally, KMART argues that under the terms of the Assignment Agreement, RUBLOFF's claims are barred.  As discussed below, all of KMART's contentions are without merit.  First, RUBLOFF's claims for damages accrued prior to the time RUBLOFF and KMART entered into the Assignment Agreement.  Second, KMART's arguments ignore the fact that on January 25, 2002, the bankruptcy court entered an order approving the rejection of the Master Leases.  And finally, KMART ignores that under the rules of contract construction, it is clear that the term "Leases" as contained in the Assignment Agreement refers solely to the Master Leases and as such the provisions in the Assignment Agreement relating to Rubloff's assumption/indemnification did not apply to the Subleases.

1

## II.    ARGUMENT

### A.    The standard of review to be applied in this case is *de novo.*

In its Brief, KMART acknowledges that much of the bankruptcy court's opinion addresses issues of law which are to be reviewed *de novo. Mungo v. Taylor*, 355 F.3d 969, 974 (7th Cir. 2004); *Golant v. Care Comm., Inc.*, 216 B.R. 248, 252 (N.D.Ill. 1997); *Leibowitz v. Parkway Bank & Trust Co.*, 210 B.R. 298, 301 (N.D.Ill. 1997). However, KMART also asserts that the bankruptcy court made a factual finding regarding the parties' intent in using the term "Leases" in the Assignment Agreement which KMART incorrectly asserts should be reviewed on a clearly erroneous standard.

Although findings of fact are to be reviewed for clear error, mixed questions of law and fact are to be reviewed *de novo. Id.* Although the bankruptcy court did make the factual finding regarding the parties' intent in defining the term "Leases" in the Assignment Agreement, prior to making that decision the bankruptcy court made the legal conclusion that the language in the Assignment Agreement itself was ambiguous. (Rubloff R.22 at p.15). Thus, prior to the time that the bankruptcy court made the factual finding that the parties intended the term "Leases" to refer to both the Master Leases and Subleases, the bankruptcy court made the legal conclusion that the language of the Assignment Agreement itself was ambiguous. But for that finding, the bankruptcy court would not have been entitled to consider any extrinsic evidence to make that factual finding. *Wonderland Shopping Center Venture LP v. CDC Mort. Capital, Inc.*, 274 F.3d 1085, 1092 (6th Cir. 2001); *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 462, 706 N.E.2d 882, 884 (1999).

Ultimately, in concluding that the term "Leases" as used in the Assignment Agreement was intended to include both the Master Leases and Subleases, the bankruptcy court considered both issues of law and fact. For that reason, because the bankruptcy court's conclusion was a

mixed question of law and fact, this Court should review that finding under a *de novo* standard. Further, as all of the remaining issues to be reviewed by this Court are issues of law, this entire appeal should be reviewed on a *de novo* basis.

**B.**    **KMART anticipatorily repudiated its obligations under the Subleases.**

KMART incorrectly argues that KMART could not have anticipatorily repudiated its requirements under the Subleases because it did not make an unequivocal, definitive statement that it would not perform its obligations under the Subleases. The doctrine of anticipatory repudiation requires an unequivocal, definitive manifestation of intention that the breaching party would not perform its obligations under the contract. *Stonecipher v. Pillatsch,* 30 Ill.App.3d 140, 332 N.E.2d 151 (2d. Dist, 1975). In this instance, KMART made numerous unequivocal, definitive manifestations of intention that it would not perform its obligations under the Subleases.

KMART made it clear both in conversations with representatives of RUBLOFF that the Master Leases and Subleases had no economic value to KMART, were a drain on KMART's cash resources, and that KMART was absolutely going to reject all of the Master Leases and Subleases. (Rubloff R. 22 at p.4; Rubloff R. 16 at p.8; Rubloff R. 2 at p.8, 17; Rubloff R. 14; Rubloff R. 23 at p.28-31; Rubloff R. 16 at p.9).

Even beyond the numerous oral statements made by KMART's representatives that it had every intention of rejecting the Master Leases and Subleases (and therefore breaching its obligations under the Subleases), KMART filed a Motion to Reject the Master Leases and Subleases with the bankruptcy court on January 22, 2002 stating that the Master Leases and Subleases were of no economic value, were a drain on KMART's cash resources, and should be

3

rejected.[1]  (Rubloff R. 2 at p.8).  RUBLOFF knew at that time that KMART was going to reject the Master Leases and Subleases.  Therefore, RUBLOFF at that time entered into an interim agreement with KMART whereby RUBLOFF agreed to cover all of KMART's costs and expenses under the Master Leases from January 22, 2002 through the date that the Master Leases were either assumed and assigned or rejected by KMART.  In exchange for that agreement, KMART agreed to move the Master Leases and Subleases associated with RUBLOFF from Schedule A under the Motion to Reject for immediate rejection to Schedule B, for rejection upon ten days written notice.  (Rubloff R. 16, p. 9)  This agreement was the beginning of RUBLOFF's mitigation of its damages.

An additional unequivocal, definitive statement that KMART was not going to perform its obligations under the Subleases was made by KMART when it required RUBLOFF to enter into the Assignment Agreement as a condition precedent to KMART's not rejecting the Master Leases.  (Rubloff R. 23 at p.4; Rubloff R. 16 at p.8).  As a result, the bankruptcy court should have concluded that as a matter of law, KMART made clear and unequivocal manifestations of its intent to not fulfill its obligations under the Subleases to maintain the Master Leases in full force and effect as required by the express provisions of paragraph 31 of the Subleases, and as required by the implied covenant of good faith and fair dealing and the covenant of quiet enjoyment which applied to the Subleases.  (Rubloff R. 22 at p.5; Rubloff R. 3).

---

[1] On page three of its response brief, KMART states that it "represented only that it *would* seek approval to reject the contracts if an acceptable solution were not achieved."  This statement is false as KMART had already filed the motion to reject the Master Leases and Subleases.  Under that motion as originally filed, KMART made it clear that the Master Leases and Subleases were going to be immediately rejected.  But for the agreement with RUBLOFF, the Master Leases and Subleases would have indeed been immediately rejected.

**C.    Contrary to KMART's assertions, the bankruptcy court never found that the actions of KMART did not amount to anticipatory repudiation; rather, the bankruptcy court found that it did not need to address that issue pursuant to Section 365 of the Bankruptcy Code. However, even that conclusion was erroneous.**

The bankruptcy court never found that the actions of KMART as set forth above did not amount to anticipatory repudiation. What the bankruptcy court did state was:

1.    "Stated another way, to conclude that the mere filing of the Rejection Motion, and/or other statements of KMART amounted to an anticipatory repudiation of the Subleases would render Section 365 meaningless." (Rubloff R. 22 at p.13).

2.    "From yet another perspective, that of the creditor's burden of proof, no matter how unequivocal a debtor in possession's statements are prior to the rejection becoming effective, those statements are effectively rendered equivocal because of the of the operation of Section 365 of the Bankruptcy Code." (Rubloff R. 22 at p.13).

The bankruptcy court did not find that KMART's statements and conduct did not amount to anticipatory repudiation as KMART argues. Rather the bankruptcy court's legal conclusion is that it doesn't make a difference what a debtor in possession states or does, as Section 365 provides that a debtor in possession can never be found to have anticipatory repudiated a contract. Without conceding the bankruptcy court's analysis is correct in this regard, RUBLOFF does not have to overcome this artificial barrier KMART seeks to establish.

KMART's argument and the bankruptcy court's order that no anticipatory repudiation could have occurred until such time as the bankruptcy court entered an order approving the rejection of the Master Leases and the Subleases ignores the plain language of the order entered by the bankruptcy court on January 25, 2002. (Rubloff R. 3). In that order, the bankruptcy court approved the rejection of the Master Leases and Subleases. Section 365 of the Bankruptcy Code was satisfied. No further action or approval of the bankruptcy court was required for KMART to

70552228v2 810787

reject the Master Leases. Based on the stipulation of the parties (Rubloff R. 16 at p.9), any argument that KMART asserts that it had not anticipatory repudiated the Master Leases is meritless. KMART's sole and only defense that it did not repudiate the Master Leases is based on the theory that no matter what KMART states or does, its conduct has to always be considered equivocal until the bankruptcy court enters an order approving rejection under Section 365 of the Bankruptcy Code. The order entered by the bankruptcy court on January 25, 2002, removes that impediment. As of January 25, 2002, KMART could no longer hide behind Section 365 of the Bankruptcy Code. As of January 25, 2002, the bankruptcy court had approved the rejection of the Master Leases.

**D.**    **KMART's argument that it could not have repudiated the Subleases because it did not ultimately reject the Master Leases and Subleases is erroneous.**

KMART next attempts to assert that the above-referenced unequivocal, definitive manifestations of its intent to repudiate the Subleases could not amount to anticipatory repudiation because KMART ultimately did not reject the Master Leases and Subleases. However, that argument requires this Court to completely disregard the doctrine of anticipatory repudiation.

After all of the above-referenced unequivocal, definitive manifestations of intent were made to RUBLOFF, RUBLOFF knew at that point in time that unless RUBLOFF entered into the Assignment Agreement with KMART, KMART would reject the Master Leases and cause a substantial amount of damages to RUBLOFF and the sub-subtenants. (Rubloff R. 22 at p.4). Both Illinois and Michigan law require the injured party in a contract to make reasonable efforts to mitigate its damages. *King v. Taylor Chrysler-Plymouth, Inc.*, 184 Mich.App. 204, 457 N.W.2d 42 (Mich.App. 1990); *Harmon Ins. Agency v. Thorson*, 226 Ill.App.3d 1050, 590 N.E.2d 920 (3d Dist. 1992); *Ashe v. Sunshine Broadcasting Corp.*, 90 Ill.App.3d 97, 412 N.E.2d 1142

70552228v2 810787

(5th Dist. 1980). As such, as it was required to do, RUBLOFF attempted to mitigate its damages from KMART's anticipatory breach and repudiation of the Subleases by obtaining an assignment of KMART's rights in the demised premises under the Master Leases. But for the entry into that Assignment Agreement, RUBLOFF's claims would not be limited to the spread between the rents payable under the Master Leases and the Subleases, but would also include RUBLOFF's claims for damages resulting from the loss of the interest of the sub-subtenants and subleasehold lenders. In short, but for RUBLOFF's efforts to mitigate its damages, RUBLOFF's claims against KMART's estate would have increased by tens of millions of dollars. Further, KMART would have also be faced with the Master Landlords' lease rejection claims. (Rubloff R. 22 at p.5). Despite that fact, KMART's position and the order of the bankruptcy court punishes RUBLOFF for mitigating its damages and reducing the claims against the estate by finding that by entering into the Assignment Agreement the claims were forfeited. That ruling is not just, equitable, or supported by law.

KMART seeks a safe-haven from the doctrine of anticipatory repudiation by claiming that no anticipatory repudiation could have occurred until such time as the bankruptcy court entered an order approving the rejection of the Master Leases and Subleases. In short, KMART argues that because the order entered by the bankruptcy court provided that the Subleases could be rejected upon ten (10) days written notice, and because that written notice was never sent, the rejection of the Master Leases and Subleases was never formally approved. Once again KMART's argument requires this Court to completely disregard the doctrine of anticipatory repudiation.

First and foremost, the bankruptcy court did enter an order approving the rejection of the Master Leases and Subleases. Although that order did provide that the Master Leases and

70552228v2 810787

Subleases would be deemed rejected upon KMART sending out ten days written notice, it did not require any further court review or approval. (Rubloff R. 3). Ultimately, pursuant to that order, the bankruptcy court approved the rejection of the Master Leases and Subleases and required nothing more than a ten day notice to be sent by KMART. (*Id.*) Because the bankruptcy court had entered this order providing that no further bankruptcy court review or approval of the rejection of the Master Leases and Subleases was necessary, that provides even further evidence of KMART's anticipatory repudiation of the Master Leases and Subleases. Contrary to KMART's assertions, the bankruptcy court's order did not provide any right to a creditor to object or to be heard following the entry of the order. (*Id.*)

Although KMART attempts to, there is no reasonable argument that the January 25, 2002 order did not grant KMART the authority to reject the Master Leases. The question thus becomes, as of January 25, 2002, did KMART's actions and conduct amount to anticipatory repudiation of the Master Leases which allowed RUBLOFF to take the necessary steps to protect its interest without waiving its claim for KMART's breach of the Subleases. KMART has stipulated that it had made it clear to RUBLOFF on January 23, 2002, and in subsequent communications, that it was KMART's contention to seek rejection of the Master Leases and Subleases (KMART obtained Court approval to reject the Master Leases and Subleases on January 25, 2002) in the absence of reaching an agreement on assignment and assumption. (Rubloff R. 16 at p.9). In its Brief, KMART asserts that "KMART as a debtor in possession could not make any definite statement regarding its intent not to perform, as it was obligated to first seek and obtained bankruptcy court approval before making any decisions to breach a contract obligation." (KMART Brief at 20). As discussed herein, KMART has stipulated that it

8

made such a decision and it also obtained Court approval to carry out the decision. The holding Beecche has no application to the facts in this case[2].

KMART made it clear on numerous occasions as set forth above that it had every intent of rejecting the Master Leases and Subleases. (Rubloff R. 22 at p.4; Rubloff R. 16 at p.8; Rubloff R. 2 at p.8, 17; Rubloff R. 14; Rubloff R. 23 at p.28-31; Rubloff R. 16 at p.9). KMART readily admits that it would have sent the ten day notice and rejected the Master Leases but for RUBLOFF mitigating its damages and entering into the Assignment Agreement. Contrary to the position asserted by KMART, KMART's statements that it intended to reject the Master Leases and Subleases were not conditioned upon anything. Rather, KMART has stipulated that on numerous instances that it was going to reject the Master Leases and Subleases. (Rubloff R. 22 at p.4; Rubloff R. 16 at p.8; Rubloff R. 2 at p.8, 17; Rubloff R. 14; Rubloff R. 23 at p.28-31; Rubloff R. 16 at p.9). The only reason that it did not was because after KMART made it well known that it was going to reject and after KMART had obtained bankruptcy court approval to reject, RUBLOFF agreed to mitigate its damages and enter into the Assignment Agreement. As such, the anticipatory repudiation was effective no later than January 25, 2002, the date of the order approving rejection and prior to the time that the Assignment Agreement had been drafted.

E.    **Through its statements and actions, KMART repudiated both the Master Leases and Subleases.**

KMART next asserts that RUBLOFF failed to explain how KMART anticipatorily repudiated the Subleases but not the Master Leases. KMART seems to be asserting that if there

---

[2] To support this proposition, the bankruptcy court cites to *In re: Beech Systems Corp.*, 164 B.R. 12, 16 (Bankr. N.D.N.Y 1994). In that case, the Debtor fully performed all of its obligations, post-petition under a contract with a third party, D.A. Elia Construction Corp. ("Elia"). In a dispute over payment, Elia asserted that the Debtor's failure to notify it of its bankruptcy filing and its failure to assume the contract under Section 365 of the Bankruptcy Code constituted an "unequivocal rejection of the agreement." Id. at 16. The bankruptcy court in Beeche rejected Elia's arguments that the mere filing of the bankruptcy amounted to a breach of the argument and that the Debtor had until the confirmation to assume the agreement. Id. at 16.

had been an anticipatory repudiation of the Master Leases that RUBLOFF's right to the premises would have been terminated, thereby eliminating RUBLOFF's claims. That argument is quite simply wrong. KMART made it clear through all of the above-referenced stipulation and statements that it intended to reject both the Master Leases and Subleases. (Rubloff R. 22 at p.4; Rubloff R. 16 at p.8; Rubloff R. 2 at p.8, 17; Rubloff R. 14; Rubloff R. 23 at p.28-31; Rubloff R. 16 at p.9). Therefore, KMART did anticipatorily repudiate its obligations under both the Master Leases and Subleases. That anticipatory repudiation did not leave the Master Leases null and void nor did it terminate RUBLOFF's right to the premises. Rather, it simply forced RUBLOFF's hand to mitigate its damages by entering into the Assignment Agreement. The fact that KMART anticipatorily repudiated its obligations under both the Master Leases and Subleases does not eliminate RUBLOFF's claim; rather, it is the basis for it.

Further, there is no requirement that RUBLOFF prove that KMART anticipatorily repudiated its obligations under the Master Leases. Rather, RUBLOFF need only prove that KMART anticipatorily repudiated its obligations under the Subleases to cause damages to RUBLOFF, thereby entitling RUBLOFF to the Claims.

F.    **KMART also repudiated its obligations under the Bolingbrook and Kentwood Master Leases and Subleases.**

KMART next argues that RUBLOFF's position is watered down by the fact that it has asserted that KMART anticipatorily repudiated its obligations with respect to the Master Leases and Subleases involving the Bolingbrook and Kentwood properties due to the fact that KMART never filed a Motion to Reject the Master Leases and Subleases involving those properties. However, by that argument KMART assumes that anticipatory repudiation can only exist when a Motion to Reject the Master Leases and Subleases associated with those properties is filed. However, anticipatory repudiation only requires an unequivocal manifestation of intent that a

10

party will not perform its obligations under the contract. *Stonecipher v. Pillatsch*, 30 Ill.App.3d 140, 332 N.E.2d 151 (2d. Dist, 1975). The facts involving the Bolingbrook and Kentwood properties were ultimately the same as the other properties which KMART actually filed the Motion to Reject. (Rubloff R. 23 at p.34). KMART stipulated that the leases for Bolingbrook and Kentwood were in the same situation as the other six leases. (Rubloff R.16 at p. 10). Ultimately, there was very little doubt that but for the Assignment Agreement, KMART would have rejected the Master Leases and Subleases associated with the Bolingbrook and Kentwood properties as well. *Id.*

G.    **The Sublease terms do not bar RUBLOFF's claims.**

In a last ditch effort to avoid the doctrine of anticipatory repudiation, KMART asserts that because Article 27 of the Sublease provides that the Sublessee (RUBLOFF) shall only look to a transferee for performance under the Sublease after the property is transferred, RUBLOFF may only look to itself to satisfy any obligations under the Subleases as the transferee under the Assignment Agreement. However, KMART's argument in this regard again requests that this Court ignore the doctrine of anticipatory repudiation. As set forth above, RUBLOFF's claims for KMART's anticipatory breach of the Subleases accrued, at the latest, on January 25, 2002 when the bankruptcy court entered the order approving the rejection of the Master Leases. As of that date, no further order or action of the bankruptcy court was required for KMART to reject the Master Leases and KMART's definitive, unequivocal manifestations of its intent to RUBLOFF that it would not perform its obligations under the Master Leases was a clear repudiation of KMART's duties under the Subleases. See *Kenisoft Development Corp. v. Softbank Holdings, Inc.*, 139 F.Supp.2d 869 (N.D.Ill. 2001); *Paul v. Bogle*, 193 Mich.App. 479, 493; 484 N.W.2d 728 (Mich.App. 1992). As such, the anticipatory repudiation had already occurred prior to the time that RUBLOFF entered into the Assignment Agreement. Once that

11

anticipatory repudiation occurred, RUBLOFF's damages accrued and RUBLOFF was entitled to take immediate steps to protect its interest. See *Central States SE and SW Pension Fund v. Basic American Industries, Inc.*, 252 F.3d 911, 915 (7th Cir. 2001) (holding that announcement by one party that it has no intentions of fulfilling his obligations under a contract is a breach and allows the non-breaching party to take steps to protect his interest); *Stanton v. Dachille*, 186 Mich.App. 247, 252; 463 N.W.2d 479 (Mich.App. 1990). Because RUBLOFF's damage claim accrued no later than January 25, 2002, and because Article 27 of the Subleases does not release KMART from claims which arose prior to the assignment of the Master Leases to RUBLOFF, KMART incorrectly asserts and the bankruptcy court incorrectly concluded that Article 27 of the Subleases releases KMART from the claims.

**H.     The Assignment Agreement does not bar RUBLOFF's claims.**

In KMART's Response Brief, KMART has again asserted the argument that RUBLOFF waived its claims pursuant to the language in the Assignment Agreement itself and that RUBLOFF assumed the obligations of KMART through the Assignment Agreement.    In particular, KMART asserts that because paragraph 5 of the Assignment Agreement provides that RUBLOFF would indemnify KMART and hold KMART harmless against all claims arising in connection with the Leases, RUBLOFF has waived its claims.    In short, KMART argues that because the term "Leases" includes both the Master Leases and Subleases, RUBLOFF's claims must fail.    KMART also argues that RUBLOFF assumed the obligations of KMART through the Assignment Agreement because RUBLOFF assumed the obligations under the "Leases". However, KMART's interpretation as well as the interpretation of the bankruptcy court erroneously ignores the operative provisions of the Assignment Agreement and basic rules of contract construction, which the bankruptcy court should have considered and which clearly demonstrate that the term "Leases" does not include the Subleases.

12

Under rules of contract construction, if a term within a specific provision of the Lease is not clear, before looking to extrinsic evidence, the Court must look to the remaining terms of the contract. *Wonderland Shopping Center Venture LP v. CDC Mort. Capital, Inc.*, 274 F.3d 1085, 1092 (6th Cir. 2001); *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 462, 706 N.E.2d 882, 884 (1999). Both the bankruptcy court, and now KMART, ignores this principal of contract construction. In its opinion, the bankruptcy court stated:

> This Assignment Agreement provides that KMART would assume and assign its interest under,
>
>> Certain leases, more particularly described in Schedule 1 attached hereto and made a part hereof (as the same may have been amended, supplemented, or extended from time to time), and together with any and all other leases or agreements affecting the Premises [(hereinafter defined)], (individually, a "Lease" and collectively, "the Leases"), whereby [KMART] leases from the Landlord as set forth in Schedule 1 certain property more particularly described in Schedule 1 and in the leases. [(Collectively, the "Premises") and]
>
> (Joint Ex. 5) Schedule 2 describes the Subleases. The meaning of the word "Leases" in the quoted language is ambiguous. The words together with any and all other leases, before the parenthetical definition of Leases could be read to include the Sublease. On the other hand. The words after the parenthetical "whereby KMART leases from the Landlord", could be read to exclude the Subleases. The Court may consider extrinsic evidence to clear up the ambiguity. However, the Court's analysis skip the step required under the rules of Contract Construction in both Michigan and Illinois which requires the Court to look at the remaining terms of the contract before looking outside the terms of the Contract. (Rubloff R. 22 at p.14-15).

The term "Leases" is a defined term in the Assignment Agreement. If the definition of the term "Leases" is used in the Assignment Agreement is clear and unambiguous, then that is the end of the analysis. *Wonderland Shopping Center Venture LP v. CDC Mort. Capital, Inc.*, 274 F.3d 1085, 1092 (6th Cir. 2001); *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 462, 706 N.E.2d 882, 884 (1999). Paragraph 9 of the Assignment Agreement provides a separate definition of the term "Subleases" and identifies those Subleases as "more particularly described

13

on Schedule 2 attached hereto." (Rubloff R. 12). The "Leases", on the other hand, are attached as Schedule 1. Further, not only did the Subleases have their own separate definition, none of the Subleases are listed in Schedule 1 where the "Leases" were listed. This fact alone reveals that the term "Leases" necessarily could not have included the Subleases.

Paragraph 3 of the Assignment Agreement provides even further evidence that the term "Leases" did not include Subleases. Paragraph 3 of the Assignment Agreement obligated RUBLOFF to assume KMART's obligations as tenant, including the payment of any and all rents due under the Leases. (Rubloff R. 12). If the term "Leases" included the Subleases, this provision would be rendered meaningless as KMART was not the tenant and did not pay rents under the Subleases.

Finally, Roman numerate (i) of paragraph 3 of the Assignment Agreement requires that RUBLOFF reimburse KMART for any and all base rent and costs incurred by KMART under the "Leases" from and after January 22, 2002. Because it was impossible for KMART to incur any base rents or costs under the Subleases as KMART was not a tenant under the Subleases, the term "Leases" in Roman numerate (i) of paragraph 3 cannot possibly include the Subleases.

Therefore, the bankruptcy court should have first analyzed the language in the Assignment Agreement itself and concluded that as a matter of law the term "Leases" cannot possibly include the Subleases. *Wonderland Shopping Center Venture LP v. CDC Mort. Capital, Inc.*, 274 F.3d 1085, 1092 (6th Cir. 2001); *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 462, 706 N.E.2d 882, 884 (1999) Instead of performing an analysis and reviewing the rest of the Assignment Agreement as required to do before looking outside of the four corners of the Assignment Agreement, the bankruptcy court concluded that the terms are ambiguous and after

considering the e-mails exchanged between counsel for KMART and RUBLOFF, that the word "Lease" as used in the Assignment Agreement includes the Subleases. (Rubloff R. 22 at p.15).

As an initial matter, RUBLOFF asserts that the e-mail exchange referred to by the Court which are Joint Ex. 3 submitted to trial actually shed no light on the issue one way or the other. What does shed light on the issue, which KMART ignores, are the orders which were entered by the bankruptcy court allowing the Debtor to assume and assign the Leases to RUBLOFF. In those orders, which are Joint Ex. 7 (Rubloff R. 5), the bankruptcy court approved the Assignment Agreements which provided for the assignment of the Master Leases only and not the Subleases. In connection with the eight properties involved here, the bankruptcy court actually entered six different orders authorizing the Debtor to assume and assign certain unexpired property Leases to RUBLOFF. (Joint Ex. 7) (Rubloff R. 5). While the language in the orders are not absolutely identical, substantively the provisions in the orders are the same. For instance, the Bolingbrook order provided:

> 1. Debtors are authorized to assume that certain unexpired Lease of nonresidential real property as set forth on Schedule A along with any and all easements, licenses, nondisturbance agreements and other similar agreements entered into by the Debtors which relate to the their use and occupancy of the Leased property (the "Property") and all amendments, licenses, consents and other similar agreements between the Debtors and the Landlord under the Lease (the "Landlord") relating to the property (collectively, the "Real Property Lease"). . . .

> 8. As of the Assignment Date, the Debtors shall be released and forever discharged of any and all obligations and claims under the Real Property Lease, without any further action by the Landlord or order of the Court.

It is clear that the orders entered by the bankruptcy court orders approving the assumption and assignment of the specific Master Leases, provided for only the assignment of the Master Leases and all amendments, licenses, consents, and other similar documents one finds in connection with commercial leases between KMART and the Landlord of the particular Master Lease. The orders are silent as to the Subleases and Schedule A to each of the orders refer solely

and only to the Master Leases. In reviewing that, and taking into context that the orders were entered in accordance with the Assignment Agreement, it is clear that the defined term "Leases" in the Assignment Agreement refers solely to the Master Leases.

The Assignment Agreement provides in Paragraph No. 1, "As of the Assignment Date, Assignor hereby assumes the Lease . . .". The only leases assumed by RUBLOFF were the Master Leases. Paragraph No. 2 of that same Agreement provides, "As of the Assignment Date, Assignor hereby assigns, transfers and sets unto the Assignee, its successors and assigns, all of Assignor's right, title and interest in, to and under the Leases." The only leases assigned by KMART to RUBLOFF were the Master Leases. Paragraph No. 3 of that same Agreement provides, "Assignee [RUBLOFF] and its successors and assigns hereby assume and agree to keep, perform, fulfill or cause to be performed all of the terms, covenants, conditions and obligations contained in the Leases, which, by their respective terms therein, are opposed upon Assignor [KMART], as tenant, . . .". Again, there can be no reasonable argument that the only Leases on which KMART was the tenant were the Master Leases. Paragraph No. 9 of the Assignment Agreement provides, in part, ". . . Assignee paying to Assignor (a) any and all amounts designated as 'cure claims' due and payable to the Master Landlords in connection with Assignor's assumption of the Leases, . . .".

Rather than addressing any of these points, KMART has again chosen to rely only upon the language of the "whereas" clause in the Assignment Agreement, which does not state that the Subleases are to be included with the "Leases". The language on which KMART's entire argument hinges, reads "and all other leases or agreements affecting the Premises"

The phrase "all other leases or arguments affecting the Premises" refers to all the multiple agreements which constitute the Master Leases which are being assigned. Joint Ex. 11 contains

copies of all the Master Leases for the eight properties which are the subject matter of the claims (RUBLOFF R. 13). For the Jennison property, there is the Master Lease, five amendments to the Master Lease, and other agreements between the landlord and tenant under the Master Lease. For the Homewood property, there is the original Master Lease, a restated and amended Master Lease, and amendments to the Master Lease. For the Rockford property, there is the lease, a guaranty agreement, a memorandum of lease, extensive exhibits to the Master Lease, including an option to purchase. For the Walker property, there is the Master Lease, an assignment of the Master Lease, five amendments to the Master Lease, another assignment of the Master Lease and other agreements affecting the Master Lease. The same is true for all eight Master Leases involved herein. It is clear from a review of the language of the Assignment Agreement, which assigned only the Master Leases, that the phrase "all other leases or agreements affecting the Premises" referred to the Master Leases and the various agreements and documents relating to the tenant's rights and obligations under the Master Leases.

If the Subleases were to be included as "Leases", there would be no need for a separate definition for the Subleases or a separate schedule. Rather, if the Subleases were intended to be included in the term Leases, then the Subleases should have been attached as Schedule 1 with the other leases. For all of those reasons, the extraneous documents to the Assignment Agreement also should have led the bankruptcy court to the same conclusion that the term "Leases" in the Assignment Agreement did not include the Subleases; and therefore, RUBLOFF did not waive its claims under paragraph 5 of the Assignment Agreement wherein it waived its claims with respect to the "Leases".

It is also important to note that KMART was the drafter of the Assignment Agreement. (Rubloff R. 23 at p.55). Under Illinois and Michigan law, any ambiguities are to be resolved

17

against the drafter. *Thomas v. Pearl Vision*, 251 F.3d 1132 (7th Cir. 2001); *Wilkie v. Auto Owners Insurance Co.*, 469 Mich. 41, 61 (2003). As the drafter of the Assignment Agreement, if KMART wanted to include the Subleases as a part of the indemnification of paragraph 5 of the Assignment Agreement, it should have included the term Subleases therein. It did not do so and the failure to do so must beheld against KMART as the drafter of that agreement. *Id.*

For all of those reasons, the bankruptcy court should have concluded that pursuant to the plain language of the Assignment Agreement the term "Leases" refers only to the Master Leases. As a result, RUBLOFF did not assume the Subleases or agree to indemnify KMART for its claims associated with the Subleases, but only against claims asserted against KMART under the Master Leases. However, even if the bankruptcy court correctly ignored the majority of the language of the Assignment Agreement and correctly concluded that the "whereas" paragraph lead to ambiguity with respect to the definition of the term "Leases", many other documents drafted by KMART and submitted to the bankruptcy court, including the bankruptcy court orders approving the actual assumption and assignment of the Master Leases should have lead the bankruptcy court to the same inevitable conclusion that the term "Leases" means solely the "Master Leases".

As was set forth in RUBLOFF's initial Brief filed with this Court, the Motion for approval of the Assignment Agreement of the Master Leases, the order of the bankruptcy court dated February 15, 2002, and the order of the bankruptcy court dated March 25, 2002, all which were drafted by KMART, provide clear examples that the term "Leases" refer only to the Master Leases and not the Subleases. (Rubloff R. 4; Rubloff R. 5). In each of those documents the term "Lease" was used to identify only the Master Leases and not any Subleases as each of those

18

documents attached only the Master Leases on the Schedule of Leases to be assumed, not any Subleases.

The bankruptcy court and KMART relied in part upon an email exchange between counsel for KMART and counsel for RUBLOFF in determining the intent of the parties as to the definition of the term "Leases". (Rubloff R. 11). However, in that same email chain counsel for RUBLOFF on January 23, 2002 wrote that KMART has agreed that it will assume and assign to RUBLOFF the twelve Master Leases. *Id.* Certainly, that email chain in and of itself does not provide for any conclusive evidence as to the intent of the parties with respect to the definition of the term "Leases". However, even if the self-serving email of counsel for KMART supports its position that the term "Leases" included the Subleases, that email chain is far outweighed by the numerous provisions of the Assignment Agreement itself as detailed above as well as the numerous subsequent documents which were all drafted by KMART which provided a clear definition that the term "Leases" included only the Master Leases and not the Subleases.

Lastly, as the drafter of the Assignment Agreement, if KMART wanted to exclude damages arising from the Subleases, it could have done so just as it did in other agreements related to Hobart, Indiana and Oaklawn, Illinois wherein KMART expressly provided that RUBLOFF would be barred from seeking any damages as a result of any breach of the respective Subleases. (Rubloff R. 9, 10). In its Brief, KMART attempts to distinguish the orders related to the Hobart and Oaklawn properties by stating that because it had already rejected those Subleases it would have been exposed to rejection damages unless RUBLOFF expressly waived those damages. KMART then goes even further than that. KMART states in its Brief: "[T]here was no need for such an expressed waiver of damages as to the Leases subject to the Assignment Agreement, as that Agreement provided for the assignment and assumption of those Leases to

70552228v2 810787

RUBLOFF – not their rejection." KMART Brief at p. 36. KMART has cited to no court order which approved the assignment and assumption of the Subleases and, as made clear above, the only Leases which were being assigned to RUBLOFF were the Master Leases. KMART implicitly agrees that in the absence of either: (i) an assumption and assignment of the Subleases or (ii) an expressed waiver of damages as to the Subleases, that KMART would be liable to RUBLOFF for its anticipatory breach of the Subleases. KMART has not pointed to any document in this Court or any court order authorizing KMART to assume and assign the Subleases. Nor, as it relates to the eight properties involved herein, can KMART point to an express waiver of damages by RUBLOFF as it relates to KMART's breach of the Sublease Agreements.

I. **RUBLOFF was not required to explicitly reserve its claims in the Assignment Agreement.**

KMART lastly makes an attempt to apply the findings in *In re Aerovias Nacionales DeColumbia, S.A. Avianca*, 323 B.R. 879, 889 (Bankr. S.D.N.Y. 2005) to the case at bar. First, KMART ignores the fact that the bankruptcy court in *Aerovias* was applying New York law which is not applicable to the case at bar. Secondly, and more importantly, in *Aerovias* the debtor-lessee and lessor first agreed to modify the leases by reducing the rent due to lessor from the debtor-lessee, and thereafter, the debtor agreed to assume those leases. *Id.* In other words, the debtor and lessor were already parties to the lease and agreed to modify it prior to assumption. *Id.* In contrast, RUBLOFF did not agree to assume the Master Leases following an

agreement to amend the Master Leases by reducing the amount of rent due thereunder[3]. In other words, RUBLOFF did not agree to reduce what it was entitled to under a lease to which it was already a party and thereafter file a claim for the difference. Rather, RUBLOFF elected to assume the Master Leases without any modification to the Master Leases whatsoever. That important difference between the facts in *Aerovias* and the case at bar renders the holding in *Aerovias* inapplicable to the case at bar.

### III.    CONCLUSION

The Response Brief filed by KMART only attempts to confuse the issues and the clear evidence which was presented to the bankruptcy court. That evidence showed that KMART made several unequivocal and definitive statements that it would not perform under the Master Leases, including filing a Motion to reject those Master Leases. Not only that, but the bankruptcy court approved the immediate rejection of those Master Leases. No further court action was necessary to reject the Master Leases after the bankruptcy court order entered the order authorizing the rejection of the Master Leases. (Rubloff R. 3). Based upon those facts, the bankruptcy court should have concluded that KMART anticipatorily repudiated the Subleases, thus permitting RUBLOFF to file the claims. Further, pursuant to the plain language of the Assignment Agreement, the bankruptcy court should have concluded that as a matter of law the Assignment Agreement applied to the Master Leases alone as the Subleases were not included in the definition of "Leases" which were assigned under that Agreement.

---

[3] At p. 37 of its Brief, KMART wrongfully accuses RUBLOFF of somehow holding back from KMART when it didn't object to certain language contained in Paragraph Nos. 14 and 16 of the assignment motion drafted by KMART. Nothing in Paragraph No. 14 or 16 states anything relating to Subleases nor was RUBLOFF's actions inconsistent therewith. As stipulated to by the parties, if KMART had rejected the Master Leases, the claims against the bankruptcy estate would have exceeded the amount of RUBLOFF's claims. (Rubloff R.16 at p.10). By assuming the Master Leases, RUBLOFF did in fact reduce the amount of claims that would have been filed against the bankruptcy estate and paid the costs of curing the outstanding defaults under the Master Leases. No claims were filed by the Master Landlords against KMART relating to the Master Leases.

21

Accordingly, this Court should reverse the holding of the bankruptcy court, enter an order that the claims are allowed and that KMART's objection thereto is overruled, and remanding this case to the bankruptcy court for proceedings regarding the amount of the claims.

Dated: March 3, 2008                    Respectfully submitted,

                                        RUBLOFF DEVELOPMENT GROUP, INC.,
                                        an Illinois corporation, Appellant

                                        BY:    HINSHAW & CULBERTSON LLP

                                        BY:    /s/Thomas J. Lester
                                               Attorney for Appellant
                                               HINSHAW & CULBERTSON LLP
                                               100 Park Avenue
                                               P.O. Box 1389
                                               Rockford, IL  61105-1389
                                               Tel (815)490-4900/Fax(815) 490-4901
                                               tlester@hinshawlaw.com

22

## CERTIFICATE OF SERVICE

I, Thomas J. Lester, an attorney, hereby certify that on March 3, 2008, I electronically filed the **REPLY BRIEF OF APPELLANT, RUBLOFF DEVELOPMENT GROUP, INC.** with the Clerk of the U.S. District Court, using the CM/ECF system reflecting service thereof to be served on:

Andrew Goldman
WILMER CUTTER PICKERING LLP
399 Park Avenue
New York, NY 10022
andrew.goldman@wilmerhale.com

William J. Barrett
BARACK, FERRAZZANO, KIRSCHBAUM,
PERLMAN & NAGELBERG, LLP
333 W. Wacker Drive, Suite 2700
Chicago, IL 60606
william.barrett@bfkn.com

and also by delivering a copy thereof via email to the above-referenced email addresses from 100 Park Avenue, Rockford, Illinois, at or before the hour of 5:00 p.m. on March 3, 2008.

/s/Thomas J. Lester
Thomas J. Lester
Attorney for Appellant
HINSHAW & CULBERTSON LLP
100 Park Avenue
P.O. Box 1389
Rockford, IL 61105-1389
Telephone: 815-490-4900
Facsimile: 815-490-4901
tlester@hinshawlaw.com

70552228v2 810787