08-76.081-JCD                                          April 23, 2008

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

RUBLOFF DEVELOPMENT GROUP, INC.,    )
                                    )
            Appellant,              )
                                    )
        v.                          )    No. 08 C 76
                                    )
KMART CORPORATION,                  )
                                    )
            Appellee.               )

## MEMORANDUM OPINION

This case is before us on appeal from Bankruptcy Judge Sonderby's Findings of Fact and Conclusions of Law and related Order of November 20, 2007, which resolved Rubloff's eight claims in the bankruptcy reorganization of Kmart Corporation ("Kmart") relating to subleases for eight Kmart stores.  For the reasons explained below, the order of the bankruptcy court is affirmed.

## BACKGROUND

In the 1990s, Kmart Corporation("Kmart") was a tenant under certain long-term leases of commercial property for its retail stores (the "Master Leases").  Prior to filing its bankruptcy petition, Kmart closed the stores and vacated the premises.  To reduce its losses, Kmart decided to sublease the properties. Between October 1998 and July 2000, Kmart subleased thirteen properties to Rubloff Development Group, Inc. ("Rubloff") pursuant

- 2 -

to individual subleases (the "Subleases") for lower rents than Kmart was obligated to pay its landlords under the Master Leases. Eight of the properties, which are located in Illinois and Michigan, are involved in this dispute. After subleasing the properties from Kmart, Rubloff in turn sub-subleased them to various regional and national retailers. In connection with the sub-subleases, Rubloff renovated and made improvements to the properties, funding the renovations through subleasehold mortgage loans on its interest as subtenant.

On January 22, 2002, Kmart filed a voluntary petition for reorganization pursuant to Chapter 11 of the United States Bankruptcy Code. Kmart also filed a motion to reject more than three hundred leases and subleases, including the Master Leases and Subleases (the "Rejection Motion"). Schedule A to the Rejection Motion identified those leases and subleases as to which Kmart sought immediate rejection. Six of the Master Leases (and the corresponding Subleases) at issue here were on Schedule A.[1] Schedule B identified other leases and subleases that were slated for rejection upon notice by Kmart to the affected parties. Kmart reserved the right "not to reject" leases and subleases listed on Schedule B "and, therefore, not to send a Rejection Notice" so that

---

[1] At that point, Kmart did not include in the Rejection Motion the remaining two properties of the group of eight at issue here because Kmart had not yet completed its economic analysis.

- 3 -

Kmart still had the option of assuming and assigning those agreements. (Rejection Mot., R. 2.)

Almost immediately upon its receipt of the Rejection Motion, Rubloff began negotiating with Kmart in order to avoid the rejection of the Master Leases. In a number of communications, Kmart told Rubloff that based on its real estate advisor's analysis, Kmart would reject the Master Leases and Subleases unless a satisfactory agreement to assume and assign them was reached.

Rubloff was concerned that in the event of rejection, it would lose the Subleases, thereby causing it to default on its obligations under the sub-subleases. Rubloff also feared exposure to sub-subtenant claims for lost profits and reimbursement of expenses for improvement of the properties. Therefore, Rubloff asked Kmart to move the Master Leases and Subleases from Schedule A to Schedule B so that Rubloff would have an opportunity to negotiate an assignment. Kmart would not agree to move the contracts from one schedule to the other unless Rubloff agreed to assume all of the contractual liabilities under the Master Leases through either the date of assumption or the date of rejection. Although Rubloff felt pressured because of what it calls Kmart's "shotgun negotiations," Rubloff agreed to these conditions. Further negotiation ensued, and on January 24, 2002, Kmart and Rubloff reached an agreement providing for Kmart's assumption of

- 4 -

the Master Leases and subsequent assignment of its interests in those leases to Rubloff.

By January 25, 2002, as a result of its negotiations and agreement with Rubloff, Kmart amended its schedules so that the Master Leases and Subleases appeared on Schedule B.  The same day, Bankruptcy Judge Sonderby entered an order granting the relief Kmart sought (the "Rejection Order").  The Rejection Order provided as follows in pertinent part:

> The rejection of the Real Property Leases shall be effective for each Real Property Lease set forth on the annexed Schedule A as of the date the Motion was filed, unless the applicable lessor objects, on any ground recognized under the Bankruptcy Code, within ten days of service of this Order on such lessor.  In the absence of a timely objection or if an objection is overruled, the effective date of the rejection of a Real Property Lease set forth on the annexed Schedule A shall be as provided in the previous sentence.  The rejection of the Real Property Leases shall be effective for each Real Property Lease set forth on the annexed Schedule B as of ten days following the delivery by the Debtors to the statutory committee and (or 20 largest creditors, if no committee has yet been formed) and the lessor under that particular Real Property Lease of a notice of rejection of that particular Real Property Lease.

(Rejection Order, R. 3,  at 2.)

Kmart never sent a notice of rejection of the Master Leases or Subleases.  Instead, on February 1, 2002, Kmart and Rubloff executed the Lease Assignment and Assumption Agreement (the "Assignment Agreement"), pursuant to which Rubloff assumed all of Kmart's obligations under the "Leases," as defined in the Assignment Agreement, subject to the bankruptcy court's approval.

- 5 -

Shortly thereafter, Kmart filed a motion seeking the court's approval, stating that the estate would avoid significant rejection claims by assumption and assignment of the leases. After a hearing, the bankruptcy court entered a series of orders from February through July 2002 approving the assumptions and assignments. At the time the orders were entered, Kmart was current on its rent payments under the Master Leases and was also fulfilling its obligation under the Subleases to provide Rubloff with possession of the properties.

On July 29, 2002, Rubloff filed eight Proofs of Claim (the "Claims") in Kmart's bankruptcy proceedings, seeking a total of $28,660,212.21, which represented the difference between the rents now payable by Rubloff under the Master Leases and the rents that were originally payable by Rubloff under the Subleases (the "Spread Amount"). The Claims were based on contract. Kmart filed its objections to the Claims, and Rubloff responded. Subsequently, the parties filed cross-motions for summary judgment with respect to the Claims.

Rubloff contended that Kmart's filing of the Rejection Motion, along with its communications to Rubloff that the Master Leases were going to be rejected, demonstrated Kmart's intent not to perform its obligations under the Subleases. According to Rubloff, Kmart's actions constituted anticipatory repudiation of the Subleases; Rubloff was damaged by this breach to the extent that

- 6 -

it lost the Spread Amount; and it entered into the Assignment Agreement in order to mitigate its damages.  In response, Kmart did not dispute that if it had rejected the Master Leases and Subleases, Rubloff's claims against the estate would have exceeded the Spread Amount.  But Kmart denied that it had anticipatorily repudiated the Subleases and asserted that even if it had, Rubloff had released any claim to the Spread Amount by the terms of the Subleases and Assignment Agreement.

After briefing and argument, Bankruptcy Judge Sonderby denied both parties' motions and found that certain issues of fact remained to be resolved.  (Tr. of Oral Ruling, Dec. 6, 2006, R. 8.) A trial was held on the Claims in May 2007.  On November 20, 2007, Bankruptcy Judge Sonderby issued a detailed written opinion titled "Findings of Fact and Conclusions of Law," In re Kmart Corp., No. 02 B 2474, 2007 WL 4556991 (Bankr. N.D. Ill.) (R. 22 ).[2]  Judge Sonderby held that § 365 of the Bankruptcy Code, which gives a debtor-in-possession the power to decide whether to assume or reject a lease, qualifies the ability of Rubloff to use the anticipatory repudiation theory to recover from the bankruptcy estate in these circumstances.  The bankruptcy court explained that application of the theory here would render § 365 meaningless.  Id. at *8.  The bankruptcy court also held that because § 365 requires

_____

[2]  On the same date, Judge Sonderby entered a companion "Order Disallowing [Rubloff's] Claim Nos. 37506, 37507, 37508, 37509, 37733, 37734, 37735, and 37773."  (R. 21.)

- 7 -

court approval before a rejection can become effective, "no matter how unequivocal a debtor in possession's statements are prior to the rejection becoming effective, those statements are effectively rendered equivocal." Id. Furthermore, the court held that even if Rubloff were entitled to claims for anticipatory repudiation, it had released those claims by virtue of certain terms of the Assignment Agreement and Subleases and/or had waived the claims by failing to raise them when it took the assignment.

Rubloff now appeals from Judge Sonderby's Findings of Fact and Conclusions of Law and related Order.   Rubloff requests oral argument.   The request is denied because the parties' briefs and the record on appeal adequately present the facts, issues, and arguments, and we would not be significantly aided by oral argument.

## DISCUSSION

This court sits as an appellate court for bankruptcy court proceedings.  We review the bankruptcy court's factual findings for clear error and its conclusions of law de novo.  See In re Smith, 286 F.3d 461, 464-65 (7th Cir. 2002).  Mixed questions of law and fact are reviewed de novo.  Samson v. Alton Banking & Trust Co. (In re Ebbler Furniture & Appliances, Inc.), 804 F.2d 87, 89 (7th Cir. 1986).  "[D]ue regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."  Fed. R. Bankr. P. 8013.

- 8 -

Rubloff raises what it deems to be ten issues for review, most of which relate to the bankruptcy court's construction of the Assignment Agreement. We have reorganized the issues into three groups:

> (1) Did the bankruptcy court err in holding that Rubloff did not demonstrate that Kmart anticipatorily repudiated the Subleases?

> (2) Did the bankruptcy court err in holding that Rubloff waived its claims by failing to raise them when it entered into the Assignment Agreement?

> (3) Did the bankruptcy court err in holding that Rubloff released its claims by virtue of certain terms in the Assignment Agreement and Subleases?

## A.    **Anticipatory Repudiation**

Rubloff first contends that the bankruptcy court erred in determining that Kmart did not anticipatorily repudiate its obligations under the Subleases. Rubloff concedes that the mere filing of a bankruptcy petition is not enough to establish anticipatory repudiation. See Central States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., 252 F.3d 911, 916 (7th Cir. 2001). Its position is that Kmart's filing for bankruptcy, together with its filing of the Rejection Motion, statements that it intended to reject the Master Leases and Subleases, and the position taken in its negotiations with Rubloff, amounted to "clear and unequivocal statements that Kmart was not going to fulfill its obligations" under the Master Leases and Subleases and constituted anticipatory repudiation of the Subleases. (Appellant's Br. at

- 9 -

17.)  Rubloff does not identify the exact point at which Kmart anticipatorily breached the Subleases, but contends that at the latest, the breach occurred on January 25, 2002, when the bankruptcy court entered the Rejection Order.  In Rubloff's view, once the repudiation occurred, Rubloff was no longer "required to object or keep the Subleases in force" and had the right to take steps to protect itself and mitigate its damages by entering into the Assignment Agreement.  (Id. at 18.)  Rubloff asserts that it is entitled to the Spread Amount as damages because it incurred those expenses as a result of Kmart's breach.

We will begin our analysis of this issue with the same starting point the bankruptcy court used: "Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code." Raleigh v. Illinois Dep't of Revenue, 530 U.S. 15, 20 (2000) (emphasis added).  (The emphasized phrase is particularly important, as discussed infra.)  The parties agree that the "underlying substantive law" is either Illinois or Michigan law, depending on the location of the store covered by a particular Sublease.  Under the laws of both states, anticipatory repudiation occurs when a party to a contract unequivocally declares or manifests its intent not to perform its obligations under the contract.  See Bituminous Cas. Corp. v. Commercial Union Ins. Co., 652 N.E.2d 1192, 1197

- 10 -

(Ill. App. Ct. 1995); <u>Paul v. Bogle</u>, 484 N.W.2d 728, 735 (Mich. Ct. App. 1992).

In the bankruptcy court, the parties disputed whether the doctrine of anticipatory repudiation applies to real estate leases under Illinois and Michigan law.  Judge Sonderby determined that she need not decide the issue because even assuming that the doctrine is applicable, § 365 of the Bankruptcy Code qualifies its use under the circumstances here.  We agree.

Section 365 of the Bankruptcy Code authorizes a bankruptcy trustee or a debtor-in-possession to assume or reject unexpired leases.[3]  Judge Sonderby described the operation of the assume-or-reject election as follows:

> When a debtor files for chapter 11, unless and until a trustee is appointed, it is a debtor in possession of the estate.  11 U.S.C. § 1107(a).  The debtor in possession has a great many of the responsibilities and powers of a chapter 11 trustee, including the power to assume unexpired leases from itself as the debtor.  Essentially, an assumption is the debtor in possession's judicially approved postpetition undertaking to fully perform all obligations under the lease for its remaining term, in return for which the other party of the lease must perform its obligations.  Rejection, on the other hand, means the debtor in possession has refused to undertake the unexpired lease.  The rejection by the debtor in possession is deemed a breach of the lease, which gives the other party to the lease a right to assert damages against the estate.  The breach, however, is deemed to occur on the petition date, and thus damages arising therefrom are only entitled to general nonpriority status and, in some circumstances, capped.  11 U.S.C. § 365(g)(1); 11 U.S.C. § 502(b)(6).

---

[3]  There is no dispute that the Master Leases and Subleases were "unexpired."

- 11 -

> The debtor in possession's decision whether to assume or reject a lease is ideally based on which course of action is more beneficial to the estate, taking into account the profitability of the lease in a reorganization scenario and the possible claims against the estate resulting from the decision. The debtor in possession will likely also consider whether it is possible and beneficial to the estate to assume the lease in order to assign it to a third-party purchaser in exchange for consideration.
>
> The debtor in possession's decision to assume or reject an unexpired lease is subject to court approval after notice and hearing. 11 U.S.C. § 365(a). Rejection is not effective until court approval. Accordingly, even if the debtor in possession decides to reject an unexpired lease, until that rejection becomes effective, there is always the possibility, albeit slim, that the debtor in possession may ultimately end up "exercising the affirmance option." Indeed, that is what happened in this matter with respect to the Master Leases. . . . Kmart and Rubloff worked out an arrangement for Rubloff to take an assignment of Kmart's interest in the Master Leases after Kmart assumed them.

Kmart, 2007 WL 4556991 at *7 (some citations and internal quotation marks omitted).

Rubloff's argument boils down to a contention that by invoking and following the Bankruptcy Code's procedure for the treatment of unexpired leases, Kmart anticipatorily breached the Subleases, and Rubloff is therefore entitled to damages. Rubloff cites absolutely no authority that supports its position. This dearth of authority is unsurprising, though, because as the bankruptcy court put it, "to conclude that the mere filing of the Rejection Motion and/or other statements of Kmart amounted to an anticipatory repudiation of the Subleases would render section 365 meaningless." Id. at *8. Rubloff fails to recognize that "general principles governing

contractual benefits and burdens do not always apply in the bankruptcy context.  The purpose of the Bankruptcy Code is to suspend the normal operation of rights and obligations between the debtor and his creditors."  <u>Data-Link Sys., Inc. v. Whitcomb & Keller Mortgage Co. (In re Whitcomb & Keller Mortgage Co.</u>), 715 F.2d 375, 379 (7th Cir. 1983) (internal quotation marks omitted). The debtor-in-possession is "empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have done absent the bankruptcy filing."  <u>NLRB v. Bildisco & Bildisco</u>, 465 U.S. 513, 528 (1984).  This is one of the situations where bankruptcy law qualifies and restricts the ability of the nondebtor party to an unexpired lease to invoke general contract law and remedies.  Rubloff makes much of the fact that Kmart's statements of its intent to reject the Master Leases in its negotiations with Rubloff pressured Rubloff into taking an assignment of the Leases.  We see nothing wrong with this pressure; it is part and parcel of the assume-or-reject scheme.

Rubloff devotes considerable attention to discussing whether Kmart's statements were equivocal and whether rejection was a "foregone conclusion." (Appellant's Br. at 17.)  In our view, the equivocality of Kmart's statements matters not; even if they were the most definitive statements of the intent to reject a lease, those statements would not constitute anticipatory repudiation. The doctrine cannot be applied to those actions that a debtor-in-

- 13 -

possession takes in compliance with the assume-or-reject procedure prescribed in § 365--moving for the court's approval of rejection; stating an intent to reject; using the possibility of rejection as leverage in negotiations with the nondebtor party.  Rubloff's argument is derived in part from the fact that § 365 deems an eventual rejection a "breach."  Therefore, Rubloff submits, actions that anticipate rejection constitute "anticipatory breach."  But to deem a debtor-in-possession's actions in preparation for rejection an "anticipatory breach" undermines bankruptcy policy, eviscerating the carefully structured assume-or-reject mechanism and prescribed consequences set forth in § 365.  Allowing Rubloff to treat the Subleases as repudiated simply by virtue of Kmart's expressed intent to reject would contradict the provisions of § 365.

Essentially, Rubloff seeks rejection damages for Subleases that were never rejected.  It agreed to take an assignment of the Master Leases as a result of the assume-or-reject process, a process that the Bankruptcy Code gave Kmart the right to pursue.  The bankruptcy court correctly concluded that Kmart's actions did not constitute anticipatory repudiation of the Subleases.

B.   **Waiver**

The bankruptcy court alternatively held that Rubloff waived its Claims when it took the assignment of the Master Leases, citing In re Aerovias Nacionales de Colombia, S.A. Avianca, 323 B.R. 879, 889 (Bankr. S.D.N.Y. 2005).  In Aerovias, the bankruptcy court held

- 14 -

that an aircraft lessor had no right to "rejection" damages under
the Bankruptcy Code where the lessor had agreed to accept reduced
rent in exchange for the debtor-in-possession's assumption of the
leases.   The court denied the lessor's claim for the difference
between the original rent and the modified rent, stating that for
the lessor to have retained the right to pursue rejection damages,
"it would have to be explicitly provided for in the papers."   Id.
(emphasis omitted).

In its motion seeking the court's approval of the assignments,
Kmart stated that it could avoid significant rejection claims
"entirely" through assumption and assignment to Rubloff.   As
Bankruptcy Judge Sonderby noted, Rubloff did not contest that
argument, and it made no attempt to reserve the right to assert the
Spread Amount.   Instead, it remained silent, springing its claim
for the Spread Amount on Kmart only after the assignments of the
Master Leases had been approved.   We agree with the bankruptcy
court that Rubloff waived its Claims by entering into the
Assignment Agreement without expressly reserving the right to
assert them.   Rubloff's attempt to distinguish Aerovias is
unpersuasive.

In light of our conclusions that Kmart's actions did not
constitute anticipatory repudiation and that Rubloff waived the
Claims when it entered into the Assignment Agreement, it is
unnecessary for us to address whether Rubloff released its claims

- 15 -

by virtue of certain terms in the Assignment Agreement and Subleases.

### CONCLUSION

For the foregoing reasons, the bankruptcy court's Findings of Fact and Conclusions of Law and related Order Disallowing Claim Nos. 37506, 37507, 37508, 37509, 37733, 37734, 37735, and 37773 (November 20, 2007) are affirmed.


DATE:        April 23, 2008


ENTER:    _____

          John F. Grady, United States District Judge